[Cite as *Morris v. Ohio Dept. of Rehab. & Corr.*, 2021-Ohio-3803.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Kristoffer Morris, | : | |
| Plaintiff-Appellant, | : | No. 20AP-131 |
| | | (Ct. of Cl. No. 2018-492JD) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio Department of Rehabilitation and Correction, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on October 26, 2021

**On brief**: *Swope and Swope – Attorneys At Law*, and *Richard F. Swope*, for appellant. **Argued**: *Richard F. Swope*.

**On brief**: *Dave Yost*, Attorney General, *Eric A. Walker*, and *Timothy M. Miller*, for appellee. **Argued**: *Timothy M. Miller*.

APPEAL from the Court of Claims of Ohio

BROWN, J.

{¶ 1} This is an appeal by plaintiff-appellant, Kristoffer Morris, from a judgment of the Court of Claims of Ohio finding in favor of defendant-appellee, Ohio Department of Rehabilitation and Correction ("ODRC"), on appellant's negligence claim.

{¶ 2} On March 20, 2018, appellant, an inmate at the Toledo Correctional Institution ("TCI"), filed a complaint against ODRC in the Court of Claims, alleging he was assaulted at TCI by another inmate. The complaint alleged negligence by ODRC in allowing a general population inmate to be in the presence of appellant, a protective custody inmate, and that such negligence proximately resulted in personal injury to appellant.

{¶ 3} The matter was tried before a magistrate on February 19, 2019. Appellant, who testified on his own behalf, is currently a protective custody inmate at TCI because of his "criminal case." (Tr. at 13.) According to appellant, "[t]he victims in my case have tried to hire people to kill me." (Tr. at 13.) As a protective custody inmate, appellant is "not to be around" general population inmates. (Tr. at 14.)

{¶ 4} On December 10, 2017, appellant was in the segregation unit ("TPU") at TCI due to a violation of inmate conduct rules. On that date, appellant made arrangements to place a telephone call. A corrections officer ("CO") restrained appellant from the "front" with handcuffs. (Tr. at 15.) Appellant testified "[t]hey're supposed to take you out and place you in a cage and take the cuffs off and allow you to make a phone call while you're locked" in a telephone cage. (Tr. at 16.)

{¶ 5} On the date of the events, CO Don Stewart escorted appellant to the telephone area. When they first arrived, there was another protective custody inmate "in the telephone cage and there was a [protective custody] inmate on the kiosk." (Tr. at 16.) CO Stewart took another inmate "out of the telephone cage," and CO Kent Wallace put appellant in the telephone cage. (Tr. at 16.) CO Wallace shackled appellant's leg to a stool. Appellant stated he did not observe an inmate in the doorway at the time.

{¶ 6} After being seated in the cage, appellant plugged in a tablet and began to input his institutional number and password "to log into the kiosk." (Tr. at 21.) Appellant was "facing ahead, looking at the kiosk" and typing his name when he "felt a punch in the side of my head." (Tr. at 23.) According to appellant, he "got knocked out" due to the punch. (Tr. at 23.) Appellant did not see his assailant who "came from behind me." (Tr. at 23.)

{¶ 7} At trial, appellant identified his assailant, Julian Torres, as a "segregation porter." (Tr. at 23.) Torres "passes out the trays every day" and "sweeps and mops." (Tr. at 24.) Appellant had known Torres, a general population inmate, for "[m]aybe two or three weeks" prior to the incident. (Tr. at 24.)

{¶ 8} Following the incident, appellant was treated at a hospital and underwent a "CAT scan." (Tr. at 26.) He was placed in a neck brace and received "some headache medication." (Tr. at 26.) Appellant was later treated at the infirmary, where he reported headaches and neck and shoulder pain.

{¶ 9}   On cross-examination, appellant testified he was placed in the segregation unit in November 2017 for attempting to procure unauthorized drugs.  Appellant first met Torres while in segregation.  Prior to the incident on December 10, 2017, appellant had a number of contacts with Torres who, as a porter, would stop by appellant's cell and talk to him.  During those conversations, appellant requested extra food trays, which Torres provided to him on multiple occasions.  Appellant also asked Torres to pass notes to other inmates.

{¶ 10} Appellant acknowledged he began to incur a debt to Torres of at least $25. Appellant had hoped to use the prison phone system to request money from a family member, but he could not do so because "at the time I was under that conduct report" arising out of a rules infraction for dealing in drugs.  (Tr. at 51.)  Appellant told Torres: "[L]ook man, I'm just going to have to deal with you later, I'm going to have to take care of this bill later."  (Tr. at 52.)  Appellant testified that Torres became upset and "threatened me several times."  (Tr. at 52.)

{¶ 11} Prior to the incident on December 10, 2017, appellant fashioned a weapon out of a broken razor blade, breaking the blade in half; he placed the blade under the wedding band of his "ring finger."  (Tr. at 56.)  Before arriving at the telephone cage, appellant removed the razor blade and placed it between his right index finger and thumb. During the time appellant was locked in the telephone cage, Torres walked up and down the hall area.

{¶ 12} At trial, a video depicting the telephone cage area was played.  Appellant identified Torres on the video.  When questioned whether he observed Torres on the video "walking towards you," and whether he could "actually see him," appellant responded: "Yeah, I suppose.  I'm more concerned with dialing my numbers, but * * * I know he's there."  (Tr. at 63.)  Appellant believed Torres was "up to something."  (Tr. at 65.)  According to appellant, Torres "was trying to rock me to sleep.  He was trying to set me up."  (Tr. at 64.)  Appellant acknowledged he was attempting to conceal the razor blade from the COs. Appellant did not tell any COs he was concerned for his safety from Torres.

{¶ 13} Appellant was aware Torres was going to be released from segregation the next day.  Torres had informed appellant that he wanted his money before he left the segregation unit.  When asked whether he attempted to swipe or get rid of the razor blade

while he was lying on the floor after the assault, appellant responded: "I don't know." (Tr. at 83.) Appellant acknowledged he had scratches on his head but stated: "I don't know what caused them." (Tr. at 85.) He also acknowledged Torres was wearing gloves during the incident, and that the scratches on his forehead could have been from the razor blade.

{¶ 14} Jeff Brown is a "case manager for B Block 1 and 2" at TCI. (Tr. at 100.) According to Brown, protective custody inmates are not to be in the presence of general population inmates.

{¶ 15} Thomas Ernst is a "seg control booth operator" at TCI, and his duties include controlling the gate access to the area where the incident occurred. (Tr. at 121.) On December 10, 2017, Ernst was in the control booth, but he did not observe the assault. Ernst testified he "heard * * * chains clanking around, and I believe it was an officer yelled Torres, no. And then I had come to the side of the control booth and I [saw] Inmate Morris on the ground. Inmate Torres was standing over him. And then there [were] officers that were surrounding Inmate Torres." (Tr. at 124.)

{¶ 16} Kent Wallace is a "TPU escort officer" at TCI. (Tr. at 130.) On the date of the incident, Wallace moved appellant "from the phone to the JPay." (Tr. at 130.) He did not recall seeing any general population inmates in the area at the time. When they arrived at the JPay area, located "in the circle area of TPU," Wallace placed appellant "in a life shackle on the JPay." (Tr. at 131.) Another CO, Nicholas Zimmerman, was in the area at the time. Wallace prepared an incident report following the events. He could not remember whether he observed Torres in the area prior to the incident. Wallace knew Torres was a general population inmate, but had no reason to suspect Torres was a threat to appellant's safety that day. As a result of the incident, Wallace received disciplinary action.

{¶ 17} On December 10, 2017, CO Zimmerman was in the JPay area. CO Zimmerman, who was aware Torres was a general population inmate, was escorting another inmate to the pay phone area when he "heard the commotion behind me and heard Officer Wallace * * * yelling commands to get back." (Tr. at 148.) CO Zimmerman did not actually see the assault; when he came around the corner, he observed Torres "backing away from [appellant]." (Tr. at 148.) At the time of the incident, CO Zimmerman was not aware appellant was in protective custody. CO Zimmerman stated that post orders did not require porters to be locked down "at the time." (Tr. at 144.)

{¶ 18} On the date of the incident, CO Stewart was "conducting a round" when he heard a call for assistance from other officers. (Tr. at 153.) He responded to the call and helped secure the area while medical personnel arrived. CO Stewart was aware general population inmates and protective control inmates are not to be in the same area together. Appellant never informed CO Stewart that he was afraid for his safety, nor was CO Stewart aware that Torres posed a threat to appellant.

{¶ 19} Lieutenant Jordan Reichenbaugh, an ODRC employee assigned to TCI, was not at the institution on the date of the incident. On December 9, 2017, Lieutenant Reichenbaugh counseled COs Stewart, Zimmerman, and Wallace that "as a means of best practice," they should keep protective custody inmates and general population inmates "away from each other as much as possible when in restrictive housing." (Tr. at 165.) Protective custody inmates and general population inmates can be in the presence of each other, but they are to be separated by a barrier.

{¶ 20} Peter Kimball, a major at TCI, stated there are policies and regulations that require protective custody inmates and general population inmates to be kept separate. Major Kimball was aware of instances in which protective custody inmates have been in contact with general population inmates without any acts of violence.

{¶ 21} Tara Kimball is a labor relations officer for ODRC, assigned to TCI. She identified Plaintiff's Exhibit No. 3 as a notice of discipline regarding the incident.

{¶ 22} On December 10, 2017, James Brown was the shift commander at TCI. Brown conducted an investigation of the incident, and testified disciplinary action was taken with respect to COs Wallace and Zimmerman.

{¶ 23} Robert Zilles, the healthcare administrator at TCI, reviewed the medical files for appellant. Zilles testified appellant was at the emergency room for less than one hour following the incident. A CT scan was ordered, and "was negative for any acute" findings. (Tr. at 212.) Zilles reviewed video of the incident and testified it did not "appear to me that [appellant] lost consciousness." (Tr. at 221.) During a nursing sick call, appellant was treated for a headache.

{¶ 24} Following trial, the magistrate issued a decision finding in favor of ODRC on appellant's negligence claim, finding in part that appellant failed to establish ODRC had

adequate notice of an impending attack by Torres. Appellant filed seven objections to the magistrate's report. ODRC, without leave of court, filed a memorandum in opposition.

{¶ 25} On January 30, 2020, the Court of Claims issued a decision striking ODRC's memorandum in opposition and overruling all appellant's objections. By judgment entry filed on that same date, the Court of Claims rendered judgment in favor of ODRC.

{¶ 26} On appeal, appellant sets forth the following seven assignments of error for this court's review:

> [I.] THE MAGISTRATE AND TRIAL COURT ERRED WHEN THEY FAILED TO RULE PLAINTIFF-APPELLANT'S STATUS AS A PROTECTIVE CONTROL INMATE CONSTITUTES NOTICE OF DANGER OF ASSAULT BY GENERAL POPULATION INMATES.
>
> [II.] THE MAGISTRATE AND TRIAL COURT ERRED IN FAILING TO FIND DUE TO THE CONDUCT OF THE CORRECTIONAL OFFICERS IN TPU, IN FAILING TO FOLLOW ACCEPTED SECURITY PRACTICES BASED ON ADMINISTRATIVE RULES, POLICES, AND GENERAL BLOCK ORDERS, THAT THE DEFENDANT-APPELLEE WAS NEGLIGENT.
>
> [III.] THE MAGISTRATE AND TRIAL COURT ERRED IN FINDING PLAINTIFF-APPELLANT NOT TO BE CREDIBLE.
>
> [IV.] THE MAGISTRATE AND TRIAL COURT ERRED WHEN THEY FAILED TO FIND DEFENDANT-APPELLEE WAS NEGLIGENT IN FAILING TO OBSERVE THE OBVIOUS PRESENCE OF A GENERAL POPULATION INMATE STANDING IN AN OPEN GATE TO THE JPAY KIOSK ROOM, WHICH THREE OFFICERS FAILED TO OBSERVE, GIVING TORRE[S] CLEAR ACCESS TO PLAINTIFF-APPELLANT.
>
> [V.] THE MAGISTRATE AND TRIAL COURT ERRED IN ATTRIBUTING THE ASSAULT TO A DISPUTE BETWEEN PLAINTIFF-APPELLANT AND INMATE TORRE[S], WHEN IN FACT THERE WERE NO THREATS PENDING AND THE ASSAULT WOULD NOT HAVE OCCURRED WITHOUT THE TOTAL DISREGARD OF THE DEFENDANT-APPELLEE'S CORRECTIONAL OFFICERS IN FAILING TO ENFORCE PROTECTIVE CUSTODY ORDERS, AS WELL AS OTHER RULES OF THE INSTITUTION.

[VI.] THE MAGISTRATE'S AND TRIAL COURT'S FINDINGS IN REGARD TO THE SECURITY VIDEO, DEFENDANT'S EXHIBIT B, ARE NOT SUPPORTED BY AN EXAMINATION OF THE VIDEO.

[VII.] THE DECISIONS OF THE MAGISTRATE AND TRIAL COURT ARE CONTRARY TO LAW AND AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 27} Under the first assignment of error, appellant asserts the magistrate and Court of Claims erred in failing to conclude his status as a protective custody inmate constituted notice of danger of assault by general population inmates. Appellant notes he was placed in protective custody immediately on arriving in the prison system because the victim's family paid to have him killed. Appellant argues that ODRC policy provides for protective control inmates to be separated from the general population, and he asserts a violation of such policies and procedures is evidence of negligence.

{¶ 28} In accordance with Civ.R. 53, a trial court reviews a magistrate's decision "de novo." *Skorvanek v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 17AP-222, 2018-Ohio-3870, ¶ 24, citing *Mayle v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-541, 2010-Ohio-2774, ¶ 15, citing *State Farm Mut. Auto. Ins. Co. v. Fox*, 182 Ohio App.3d 17, 2009-Ohio-1965, ¶ 10 (2d Dist.). In ruling on objections to a magistrate's decision, a trial court is required to "undertake an independent review of the matters objected to in order 'to ascertain [whether] the magistrate has properly determined the factual issues and appropriately applied the law.' " *Id.*, quoting Civ.R. 53(D)(4)(d).

{¶ 29} An appellate court reviews the trial court's adoption of a magistrate's decision "for an abuse of discretion." *Id.* at ¶ 25, citing *Mayle* at ¶ 15. Further, "[c]laims of trial court error must be based on the actions taken by the trial court, itself, rather than the magistrate's findings," and this court "may reverse the trial court's adoption of the magistrate's decision only if the trial court acted unreasonably, arbitrarily or unconscionably." *Id.*

{¶ 30} In order to prevail on a claim of negligence, "a plaintiff must establish the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." *Skorvanek* at ¶ 27, citing *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984); *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981). A plaintiff "has the burden to prove

each element of their negligence claim by a preponderance of the evidence." *Id.,* citing *Forester v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 11AP-366, 2011-Ohio-6296, ¶ 7.

{¶ 31} In regard to the "custodial relationship between the state and its inmates, the state owes a common-law duty of reasonable care and protection from unreasonable risks of physical harm." *McElfresh v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 04AP-177, 2004-Ohio-5545, ¶ 16, citing *Woods v. Ohio Dept. of Rehab. & Corr.,* 130 Ohio App.3d 742, 744-45 (10th Dist.1998). Reasonable care is defined as "that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know." *Id.,* citing *Woods* at 745. However, while "prison officials owe a duty of reasonable care and protection from unreasonable risks to inmates, * * * they are not the insurers of inmates' safety." *Phelps v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 16AP-70, 2016-Ohio-5155, ¶ 12.

{¶ 32} In *Watson v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 11AP-606, 2012-Ohio-1017, this court discussed the legal standard with respect to the liability of ODRC for an assault by one inmate on another. Specifically, we noted "[t]he law is well-settled in Ohio that ODRC is not liable for the intentional attack of one inmate by another, unless ODRC has adequate notice of an impending assault." *Id.* at ¶ 9, citing *Mitchell v. Ohio Dept. of Rehab. & Corr.,* 107 Ohio App.3d 231, 235 (10th Dist.1995). Under Ohio law, "[n]otice may be actual or constructive, the distinction being the manner in which the notice is obtained rather than the amount of information obtained." *Id.* In this respect, "[a]ctual notice exists where the information was personally communicated to or received by the party," whereas " '[c]onstructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice.' " *Id.,* quoting *Hughes v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 09AP-1052, 2010-Ohio-4736, ¶ 14.

{¶ 33} As noted, appellant contends the Court of Claims erred in failing to find negligence based on his status as a protective custody inmate. Specifically, appellant maintains such status was sufficient to put ODRC on constructive notice he was in danger of being attacked by Torres.

{¶ 34} Following the trial of this matter, the magistrate rendered a decision finding appellant "failed to prove [ODRC] had constructive notice of an impending attack on

[appellant] by Torres."  (Mag. Decision at 10.)  The magistrate further determined the evidence "does not support a conclusion that the proximate cause of the attack was [appellant's] status as a [protective custody] inmate and [ODRC's] failure to keep the inmates separated."  (Mag. Decision at 10.)  Rather, the magistrate found the evidence established that "Torres' and [appellant's] acrimonious relationship proximately caused the attack."  (Mag. Decision at 10.)  Furthermore, noting the fact appellant was classified a protective custody inmate "because of threats to his safety by the victims of his criminal conduct for which he is imprisoned," the magistrate found "no evidence that Torres was associated with the victims of [appellant's] criminal conduct."  (Mag. Decision at 10.)

{¶ 35} In his objections to the magistrate's decision, appellant asserted the magistrate erred in failing "to rule [appellant's] status as a protective control inmate constitutes notice of danger of assault by general population inmates."  (Pl's. Objs at 1.)

{¶ 36} In addressing and overruling that objection, the Court of Claims rejected appellant's "proposition that an inmate's status as a protective control inmate, as a matter of law, constitutes adequate notice of an impending assault by another inmate."  (Court of Claims' Decision at 6.)  We agree.

{¶ 37} At the outset, appellant cites no authority for the proposition that an inmate's status or classification as a protective custody inmate, standing alone, gives rise to constructive notice on the part of ODRC of an impending assault by another inmate.  We note that federal courts have rejected somewhat similar arguments, recognizing that claims resting solely on an inmate's protective custody status would effectively impose strict liability for inmate assaults on other inmates irrespective of evidence as to the knowledge of prison officials.  *See Vessey v. Owens*, N.D.Ill. No. 13 CV 7367 (June 12 2015) (addressing argument that inmates in protective custody are always prone to danger, and holding that "a general risk of violence is not enough to establish knowledge of a substantial risk of harm" because, "[w]ere that enough, prison officials would, in effect, become strictly liable for all violence" in an institution and "that, of course, is not the law"); *Akindele v. Arce*, N.D.Ill. No. 15 C 3081 (Feb. 22, 2017) (inmate's failure to protect claim may not rest on inmate's "protective custody status alone," but rather the evidence must show such inmate was "in genuine danger, above and beyond the dangers faced by most protective custody inmates" in order to establish a duty).

{¶ 38} We agree with the general reasoning of the above authorities. Thus, while appellant's protective custody status may be a factor for the trier of fact to consider in determining whether ODRC had constructive notice of an impending assault, we reject appellant's premise that protective custody status alone is sufficient to constitute constructive notice of an impending attack. Further, as found by the magistrate, the evidence presented at trial fails to suggest a link between appellant's status as a protective custody inmate and the assault at issue. Specifically, the record indicates appellant was placed on protective custody status as a result of "threats to his safety arising out of his criminal conduct for which he was imprisoned." (Mag. Decision at 8.) According to appellant, "[t]he victims in my case have tried to hire people to kill me." (Tr. at 13.) The incident involving Torres, however, was not in any way related to the reason he was placed on such status. Rather, the facts indicate that appellant, while serving time in the prison's segregation unit for a disciplinary matter, incurred a $25 debt to Torres, a prison porter. Accordingly, the record supports the magistrate's finding there was no evidence the attack was motivated by appellant's status as a protective custody inmate.

{¶ 39} As to evidence of actual notice, the magistrate found "at no point did [appellant] ever inform any [O]DRC employee regarding the threats that Torres made," and that there was "no evidence" ODRC "was ever aware that Torres threatened to harm [appellant]." (Mag. Decision at 8.) The magistrate further noted appellant "admitted * * * he never informed any [O]DRC employee that Torres threatened him or that he feared for his safety." (Mag. Decision at 10.)

{¶ 40} In addressing appellant's objection, the Court of Claims cited affidavit evidence submitted by appellant's counsel that appellant "admitted on cross-examination that, although certain corrections officers were present, he 'did not tell them he was afraid of [Inmate] Torre[s] or that Torre[s] threatened him. He did not use the kite system to notify the Defendant he was afraid or that he was threatened. [Appellant] said he never told anyone.' " (Court of Claims' Decision at 6.)

{¶ 41} The record in this case supports the findings of the magistrate and Court of Claims that appellant never informed any ODRC employee of a threat by Torres prior to the attack. Accordingly, appellant failed to show ODRC had actual notice of an impending assault.

{¶ 42} Regarding evidence going to the issue of constructive notice, the magistrate made the following findings:

> While [ODRC] was aware of the potential for harm to [appellant] because of the threats to his safety by the victims of his criminal conduct, [ODRC] did not have constructive notice of an impending attack by Torres, whom [appellant] met while in segregation. Peter Kimball credibly testified that he was aware of instances where PC inmates and general population inmates interacted with each other without any violence. Additionally, [appellant] apparently believed that he and Torres resolved their differences prior to the attack. If the attack was not foreseeable by [appellant], then the attack could not be foreseeable to [ODRC]. * * * Moreover, there is no evidence that Torres exhibited any sort of behavior that put [ODRC] on constructive notice of an impending attack. In short, [appellant's] status as a PC inmate does not appear to have contributed to Torres' attack on [appellant].

(Mag. Decision at 10-11.)

{¶ 43} To the extent appellant argues ODRC had constructive notice simply by virtue of his status as a protective inmate, we have addressed and rejected such argument. As to the remaining issue of evidence of constructive notice, there is nothing in the record to reflect ODRC had any knowledge Torres had previously threatened or assaulted other inmates. *See, e.g.*, *Literal v. Dept. of Rehab. & Corr.,* 10th Dist. No. 16AP-242, 2016-Ohio-8536, ¶ 26 (noting, in addressing issue of constructive notice, no evidence assailant had previously assaulted ODRC staff or raped any other inmate so as to permit an inference that ODRC "either knew or should have known" assailant would have attacked Literal); *Pate v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 18AP-142, 2019-Ohio-949, ¶ 15 (observing this court "has looked at an inmate's prison record or behavior preceding the attack to determine whether ODRC may be determined to have constructive knowledge of an attack"). Further, as noted by the magistrate, there was testimony by Major Kimball that he was aware of instances in which protective custody inmates and general population inmates "have been in contact with one another without any violent altercations." (Mag. Decision at 5.) On review, the record supports a determination the evidence was insufficient to show ODRC was aware of, or should have anticipated, an imminent attack by Torres on appellant. Accordingly, we find no abuse of discretion by the Court of Claims

in adopting the findings of the magistrate that ODRC lacked adequate notice of an impending attack on an inmate.

{¶ 44} In the absence of sufficient evidence that ODRC had adequate notice of an impending attack, appellant failed to demonstrate ODRC breached its duty of reasonable care toward an inmate. Accordingly, appellant's first assignment of error is not well-taken and is overruled.

{¶ 45} Appellant's second, fourth, and fifth assignments of error are interrelated and will be considered together. Under these assignments of error, appellant asserts the magistrate and Court of Claims erred in failing to find ODRC was negligent as a result of the failure of its staff to follow accepted security practices, and to observe the presence of a general population inmate standing in the open gate in the kiosk room. Appellant further challenges the magistrate's finding the assault was the result of a dispute between appellant and Torres. Appellant raised these arguments in his objections to the magistrate's decision.

{¶ 46} In response, ODRC contends these assignments of error all relate to the issue of what proximately caused Torres to attack appellant. ODRC argues that, despite threats by Torres, appellant never informed any ODRC staff of a threat by Torres even when appellant was in the phone cage and observed Torres walking past him while performing porter duties.

{¶ 47} In addressing these objections, the Court of Claims held in part:

> [Appellant's] second, fourth, and fifth objections raise issues of negligence and proximate cause.
>
> * * *
>
> Prison regulations "are primarily designed to guide correctional officials in prison administration rather than to confer rights on inmates." *State ex rel. Larkins v. Wilkinson,* 79 Ohio St.3d 477, 479 * * * (1997). Violations of internal rules and policies, however, may be used to support a claim of negligence. * * * But, even if [O]DRC corrections officers acted negligently, as [appellant] contends, negligence is without legal consequence unless [O]DRC's purported negligence is a proximate cause of an injury. * * * Because in this instance [O]DRC lacked adequate notice of an impending assault, a requirement for the imposition of liability on [O]DRC for the intentional attack of [appellant] by Inmate Torre[s] * * *, a

> legally sufficient cause is lacking to result in a consequence that
> liability should be imposed on [O]DRC.

(Court of Claims' Decision at 6, 8.)

{¶ 48} On review, we find no error by the Court of Claims in overruling these objections to the magistrate's decision. Here, where the evidence failed to demonstrate adequate notice of an impending attack, the Court of Claims properly found no liability on the part of ODRC (i.e., ODRC did not breach a duty of care to appellant to prevent an assault by Torres). *See*, *e.g.*, *Literal* at ¶ 36 (given that evidence did not permit reasonable inference ODRC had notice inmate would assault another inmate, ODRC cannot, as a matter of law, be held liable for failing to keep inmate in cell pursuant to count-time policy at time of assault). Further, as noted by ODRC, the matters raised under these assignments of error relate primarily to the issue of the proximate cause of the attack. However, even if appellant had demonstrated ODRC breached its duty of reasonable care to an inmate, we would agree with the magistrate that the evidence failed to indicate appellant's status as a protective custody inmate (and ODRC's purported violation of policies regarding separation of protective custody inmates from general population inmates) was the proximate cause of the attack. As previously discussed, while appellant was in protective custody based on threats of retaliation made by the victims of his crimes, the incident at issue (in which the apparent motivation for the attack was because appellant incurred a debt to a prison porter) had no relationship to that danger or threat.

{¶ 49} Based on the foregoing, appellant's second, fourth, and fifth assignments of error are not well-taken and are overruled.

{¶ 50} Under the third assignment of error, appellant contends the magistrate and Court of Claims erred in finding his testimony not credible. Appellant suggests the magistrate found him not credible "because of a razor blade that was never produced and some scratches on [appellant's] forehead." (Appellant's Brief at 16.)

{¶ 51} More specifically, appellant challenges the following findings by the magistrate:

> The magistrate finds that [appellant's] testimony lacked
> credibility. The video shows [appellant], who had a razor in his
> right hand, moving his right hand from side to side, right where
> two straight line cuts are found on his head. [Appellant] has no
> explanation for the cuts he received to his head and was unable

> to provide an explanation for why he swiped the razor away after the incident. The swipe is also visible on the video. The magistrate cannot think of any legitimate reason why [appellant] would use the razor on himself and is forced to conclude that [appellant's] testimony thus lacks credibility.

(Mag. Decision at 9.)

{¶ 52} As noted under the facts, appellant acknowledged he fashioned a weapon out of a razor blade that he "broke * * * in half" and then hid under the wedding band of his ring finger. (Tr. at 55.) Before going to the telephone cage, he removed the razor blade and placed it in his right hand. Appellant testified that Torres "did threaten me, but leading up to this weekend * * * we had squashed it. * * * And [Torres] said he wasn't worried about it, that me and his beef is squashed." (Tr. at 64.) Appellant also testified, however, that Torres "was trying to rock me to sleep. He was trying to set me up." (Tr. at 65.) Appellant stated he put the razor blade under his ring finger "[t]o be prepared." (Tr. at 67.) Appellant also stated he was trying to conceal the razor blade from prison officials.

{¶ 53} Video of the incident was played during cross-examination of appellant. Appellant did not know what happened to the razor blade, stating: "I don't know if it got knocked out of my hand when he hit me in the head." (Tr. at 82.) During the playing of the video, appellant was requested to "[w]atch the hand swipe," and was questioned whether he was "getting rid of the razor blade, the evidence right there?" (Tr. at 83.) Appellant responded: "I don't know." (Tr. at 83.) Appellant was then asked: "Why did you swipe the floor?" (Tr. at 83.) Appellant stated: "I don't know. I can't tell you why." (Tr. at 83.)

{¶ 54} Appellant was also questioned about scratches on his head following the incident. He acknowledged the scratches looked like "a straight line." (Tr. at 85.) He also acknowledged Torres was wearing gloves at the time of the incident, and when asked whether Torres caused the scratches, appellant responded: "I don't know. I don't know what caused them." (Tr. at 85.) When asked whether it was possible the scratches on his forehead came from the razor blade, appellant stated: "Yes sir." (Tr. at 86.)

{¶ 55} Under Ohio law, " '[c]redibility issues are not resolved as a matter of law, but are left to the trier of fact to determine.' " *Rose v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-1360, 2005-Ohio-3935, ¶ 8, quoting *Ciccarelli v. Miller*, 7th Dist. No. 03 MA 60, 2004-Ohio-5123, ¶ 35, citing *Lehman v. Haynam*, 164 Ohio St. 595 (1956).

{¶ 56} Here, the magistrate was in the best position to assess and weigh the credibility of appellant's testimony, including any inconsistencies in his account of the incident. The Court of Claims, based on its own "de novo review," independently assessed the evidence and overruled appellant's objection challenging the magistrate's credibility determination. (Court of Claims' Decision at 9.) Based on this court's review, we find the Court of Claims did not abuse its discretion in overruling this objection.

{¶ 57} Appellant's third assignment of error is not well-taken and is overruled.

{¶ 58} Under the sixth assignment of error, appellant asserts the findings by the magistrate and Court of Claims regarding the security video are not supported by the record. Appellant challenges the following findings by the magistrate:

> [ODRC] also submitted video of the attack. The video shows [appellant] being escorted to the kiosk where his hands are uncuffed and his legs are shackled to the stool. Two corrections officers and Torres are present in the area. Another inmate is escorted out of the area by one of the corrections officers. The corrections officer who escorted [appellant] to the kiosk turns [a]way from [appellant] and moves toward his desk, which is located on the opposite side of a partition separating it from the kiosk. Immediately thereafter, Torres, who was waiting by the wall several feet away, approaches quickly and appears to strike [appellant] in the side of the head. [Appellant] falls to the ground and Torres continues to attempt to punch him. [Appellant's] right hand moves to his face and it appears [appellant] is gripping an object with his right hand; at no point does it appear that [appellant] is attempting to use the object to harm Torres or to defend himself.

(Mag. Decision at 6.)

{¶ 59} Appellant maintains his review of the video warrants a different interpretation, asserting the video indicates: (1) Torres "does not approach quickly, but runs and immediately strikes [appellant]," (2) Torres is shown striking appellant in the side of the head, (3) Torres continues to strike appellant in the head and body, (4) it is "impossible to determine what, if anything," appellant had in his hand during the incident, and (5) it is "impossible to determine" what appellant may have done with the razor. (Appellant's Brief at 19-20.) Appellant also challenges findings by the magistrate as to whether the razor blade caused two lines shown on appellant's forehead.

{¶ 60} In addressing appellant's objection to the magistrate's findings, the Court of Claims found appellant's claims "not wholly without merit." (Court of Claims' Decision at 10.) Specifically, the Court of Claims noted: "While the video does not clearly show what, if anything, [appellant] had in hand or [appellant] cutting his forehead with a razor blade, the video does show [appellant's] hand engaged in a sweeping motion after the altercation, almost as if [appellant] was swiping away an object." (Court of Claims' Decision at 10.) The Court of Claims further found, however, "[m]ore importantly * * * the video does not show that [O]DRC had adequate notice of an impending assault" by Torres. (Court of Claims' Decision at 10.) Rather, the Court of Claims noted, the video shows Torres "quickly charging" appellant "when a corrections officer turned away from [appellant], thereby supporting a view that corrections officers did not have notice" of an impending assault by Torres. (Court of Claims' Decision at 10.)

{¶ 61} Here, as noted by the Court of Claims, the issue of import is whether the video supports a finding of adequate notice on the part of ODRC of an impending assault by Torres. Based on this court's review, the Court of Claims could have reasonably concluded the video evidence presented at trial did not establish such notice, and we find no abuse of discretion by the Court of Claims in overruling this objection to the magistrate's decision.

{¶ 62} Appellant's sixth assignment of error is not well-taken and is overruled.

{¶ 63} Under his final assignment of error, appellant challenges the decision of the Court of Claims as against the manifest weight of the evidence. Appellant contends that negligent supervision by COs and the failure of ODRC to follow required policies and regulations constituted the proximate cause of the assault.

{¶ 64} With respect to manifest weight challenges, judgments "supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence." *Meccon, Inc. v. Univ. of Akron,* 10th Dist. No. 12AP-899, 2013-Ohio-2563, ¶ 15, citing *Watson* at ¶ 31, citing *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279 (1978), syllabus. In applying this standard of review, "an appellate court must presume the findings of the trier of fact are correct because it is best able to observe the witnesses and use those observations in weighing the credibility of the testimony." *Watson* at ¶ 31. Further, where a trial court has determined that a plaintiff "failed to establish that ODRC breached its duty of care, our

review is limited to determining if competent, credible evidence supports the trial court's judgment." *Id.* at ¶ 32.

{¶ 65} In addressing the first assignment of error, we noted the evidence presented as to actual or constructive notice. As previously discussed, appellant acknowledged he did not inform any personnel at ODRC of a dispute with Torres or of any threat by Torres prior to the incident, nor did the evidence otherwise indicate ODRC was aware of any behavior indicating Torres presented a threat to inmates. Here, "[m]aking all reasonable presumptions in favor of the trial court's findings of fact and judgment," we conclude there was competent, credible evidence for the magistrate and Court of Claims to determine ODRC lacked adequate notice of an impending attack on appellant by Torres. *Id.* Accordingly, the decision of the Court of Claims, adopting the findings of the magistrate that ODRC did not have sufficient actual or constructive notice of an impending attack, is not against the manifest weight of the evidence.

{¶ 66} Appellant's seventh assignment of error is not well-taken and is overruled.

{¶ 67} Based on the forgoing, appellant's seven assignments of error are overruled, and the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

KLATT and MENTEL, JJ., concur.

_____