[Cite as *Dillon v. Ohio Dept. of Rehab. & Corr.*, 2023-Ohio-942.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Anna Dillon,                                              :

         Plaintiff-Appellant,            :              No. 22AP-392
                                                                          (Ct. of Cl. No. 2020-00158JD)
v.                                                           :

Ohio Department of Rehabilitation                (REGULAR CALENDAR)
and Correction,                                       :

         Defendant-Appellee.             :

---

D E C I S I O N

Rendered on March 23, 2023

---

**On brief:** *Laurel Kendall* and *Patricia Horner,* for appellant.
**Argued:** *Laurel Kendall.*

**On brief:** *Dave Yost*, Attorney General, and *Eric A. Walker,*
for appellee. **Argued:** *Eric A. Walker*.

---

APPEAL from the Court of Claims of Ohio

EDELSTEIN, J.

{¶ 1} Plaintiff-Appellant, Anna Dillon, was certified as a "senior dog handler" through a rehabilitation program offered to inmates at the Ohio Reformatory for Woman ("ORW"), an institution operated by defendant-appellee, the Ohio Department of Rehabilitation and Correction ("ODRC"). In March 2018, Ms. Dillon agreed to walk Roosevelt, a young German Shepherd/Husky mix assigned to a fellow inmate-handler in the program and owned by an ORW corrections officer. At that time, Roosevelt did not have a history of biting or causing serious injury. Ms. Dillon had previously interacted with Roosevelt without incident on multiple occasions. But, when Ms. Dillon attempted to leash and collar him for their walk on March 19, 2018, Roosevelt attacked her. The source of Ms.

Dillon's injuries—16 puncture wounds from multiple bites to her hands and arms—were not disputed by ODRC.

{¶ 2}   Ms. Dillon initiated a civil action against ODRC in the Court of Claims of Ohio relating to this incident. She alleged against ODRC claims of (1) negligence and (2) spoliation of evidence. A liability trial was held before a Court of Claims magistrate in May 2021. In September 2021, the magistrate issued her decision recommending judgment in favor of ODRC on both claims. The Court of Claims overruled Ms. Dillon's timely objections and adopted the magistrate's decision and recommendation as its own, which Ms. Dillon now appeals. We agree with the trial court's decision and affirm that judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3}   In 2018, Ms. Dillon was an inmate in the custody and control of ODRC, incarcerated at the ORW. She was enrolled in the "Pawsibility Dog Program," a reintegration program that gives ORW inmates the opportunity to care for and train dogs ("the program").[1] Dogs in the program come from three sources: (1) Circle Tail, which provides dogs to be trained as service animals; (2) the Union County Humane Society; and (3) ODRC employees, who enroll their dogs in on-site daycare or boarding.

{¶ 4}   After completing the required ten weeks of classroom and hands-on training, Ms. Dillon earned her "senior dog handler" certification. All dog handlers—including Ms. Dillon—must sign the "Inmate Handler Contract/Agreement," which describes the requirements and responsibilities of incarcerated persons enrolled in the program. (Sept. 29, 2021 Trial Tr., Ex. A.) Handlers participating in the program agree to "work as a team [and] share equal care for the dog assigned to them." (*Id.* at Item No. 11.) Handlers are "completely responsible for the dog assigned to [them]," and "[o]nly handlers currently in the program" are permitted to handle dogs. (*Id.* at Item Nos. 12, 16.) Among other things, handlers are required to take their assigned dogs out of their kennels for exercise every day.

---

[1] In the record, the parties and the trial court generally refer to the program as the "Pawsabilities" program. However, according to ODRC's website, the appropriate spelling is "Pawsibility." *See Ohio Reformatory for Women*, OHIO DEPT. REHAB. & CORR., https://drc.ohio.gov/about/facilities/ohio-reformatory-for-women (last visited Mar. 22, 2023).

(Tr. Vol. II at 329.) All dogs are housed in the rooms of their assigned handlers. (*See* Tr. Vol. II at 328-30.)

{¶ 5} At all times relevant in this case, Jeffrey Coleson, a unit manager at the ORW with approximately 30 years of dog training experience, supervised and provided handler training for the Pawsibility program. (Tr. Vol. III at 643-44; Tr. Vol. I at 216-17.) Mr. Coleson has run dog training programs in prisons since 1996, and the Pawsibility program at the ORW since 2006. (Tr. Vol. III at 643-44, 659.) At the ORW, Mr. Coleson provided classroom and hands-on instruction on how to care for and train different types of dogs. (*See* Tr. Vol. III at 675.) If needed, handlers went to Mr. Coleson for advice and techniques on how to care for, train, or control their assigned dogs. (*See* Tr. Vol. I at 61-65; Tr. Vol. II at 213-14, 365, 597-98.)

{¶ 6} Handlers assigned to a dog regularly write notes about their assigned dog in a specific notebook/folder (the dog's "handler folder"). (*See* Tr. Vol. II at 234-36; Tr. Vol. III at 676-77.) Each dog's handler folder includes details about that dog's training history, breed, eating habits, type of collar, preferences, personality, demeanor, and incidents of aggression. To assist future handlers assigned to their dog, handlers memorialize their own experiences, handling tips, and observations in that dog's handler folder. An active dog's handler folder is thus retained by the handler assigned to that dog—that is, the dog's handler folder follows the dog. When a handler is assigned a new dog, she is given that dog's handler folder. To familiarize herself with a newly assigned dog, a handler reviews the notes written by prior handlers about that dog in its handler folder. (*See, e.g.*, Tr. Vol. II at 468-70.)

{¶ 7} The inmate-secretary for the program is responsible for assigning staff dogs being boarded to inmate-handlers and maintaining the staff dog folders containing the handlers' notes. (Tr. Vol. I at 46-48, 55-56, 93-95, 105-06, 127, 156; Tr. Vol. II at 330-31.) After a staff dog's boarding stay ends, its handler places its folder on top of the filing cabinet used by the inmate-secretary to store folders of staff dogs while they are not being boarded. (*See* Tr. Vol. I at 50-51, 110-13; Tr. Vol. II at 337-38, 400, 501, 626-27.) In 2018, that filing cabinet was located in the basement and could not be locked; thus, it could be opened by anyone with access to the basement. (Tr. Vol. I at 112; Tr. Vol. II at 504-07.) When a staff

dog returns for boarding, the inmate-secretary retrieves its folder from the filing cabinet and gives it to the dog's next handler. (*See* Tr. Vol. I at 46-51, 95-98; Tr. Vol. II at 624-27.)

**{¶ 8}** Staff dogs become inactive in the boarding program for various reasons—for example the service is no longer needed, the owner's employment changes, or the dog is formally removed from the program. (*See* Tr. Vol. I at 98, 156-57.) On an as-needed or sporadic basis, an inmate-secretary for the program throws away the handler folders for inactive staff dogs. Katrina Custer—an inmate-secretary for the program in 2019 and 2020—testified it was her standard practice to dispose of a staff dog's handler folder after 90 days of inactivity in the program. (Tr. Vol. I at 98-99, 156-57.) But, this was neither a formal policy nor universally adhered to. Angela Yaeger—an inmate-secretary for the program from 2017 to March/April 2018—recalled reviewing the cabinet's contents and throwing away inactive staff dog folders she did not recognize or that had been there for a long time when the filing cabinet was full. (*See* Tr. Vol. II at 610-11, 626-27. *Compare with* Tr. Vol. II at 502.)

**{¶ 9}** These handler folders were not reviewed by Mr. Coleson or any other ODRC employees. (*See* Tr. Vol. II at 626-27; Tr. Vol. III at 667-68.) All other records pertaining to dogs in the program (e.g., vet records, vaccinations, and owner information) were unavailable to program participants and stored in Mr. Coleson's office (the "program office"). (*See* Tr. Vol. I at 242-46.)

### A. Roosevelt Prior to March 2018

**{¶ 10}** Roosevelt—a German Shepherd/Husky mix—was one of the dogs in the Pawsibility program. He was owned by ODRC employee Rebecca Dowling, a corrections officer at the ORW. (Tr. Vol. I at 59; Tr. Vol. II at 580-81.) Roosevelt was classified as a "power breed" because of his size and strength. (*See* Tr. Vol. I at 103, 106-09, 113-14, 145, 159-60, 237, 253; Tr. Vol. II at 359.) He was also described as an alpha-type dog with some dominance issues. (Tr. Vol. I at 108, 159, 253; Tr. Vol. II at 352-56, 363-64, 370-72, 492-96.) Some handlers labeled him as "reactive." (Tr. Vol. I at 107-09, 113-14, 145, 159-60, 237-53. *Compare with* Tr. Vol. II at 630.) Other handlers recounted Roosevelt exhibiting aggressive behaviors on occasion. (Tr. Vol. I at 61-65, 69-70, 75; Tr. Vol. II at 352, 354, 368, 371, 385-86, 444, 492-96. *Compare with* Tr. Vol. I at 113-14, 269; Tr. Vol. II at 599.)

Generally, he was described as a "rough player." (Tr. Vol. I at 108. *See also* Tr. Vol. I at 110, 157-58; Tr. Vol. II at 352-353, 361, 368-69, 402-03, 426-29, 440, 444-45, 493-94, 500, 593-93, 599-600, 631-32, 635.)

{¶ 11} Ms. Dowling began boarding Roosevelt at the ORW when he was approximately 6-7 weeks old. (Tr. Vol. I at 58-59, 231; Tr. Vol. II at 336, 350, 361, 604-05.) Most staff dogs in the program did not board for more than 7 consecutive days (Tr. Vol. I at 59-60, 256), but some staff dogs boarded for up to 30 days (Tr. Vol. II at 342-43). Roosevelt was typically boarded for 30 days, would go home for about 1-2 weeks, and then would be boarded again for a month. (Tr. Vol. I at 59-61; Tr. Vol. II at 376-78.) At the end of 2017, Mr. Coleson told Ms. Dowling that Roosevelt needed to be temporarily removed from the ORW program. (Tr. Vol. I at 248-49; Tr. Vol. II at 378-79, 386-89.) Testimony at trial suggested this was not the first time. (*See* Tr. Vol. I. at 69-71; Tr. Vol. II at 437, 518, 563.) Mr. Coleson explained Roosevelt was temporarily removed on this occasion because he was showing signs of stress. (Tr. Vol. I at 248-49.) After leaving the program for about three months, Roosevelt returned approximately one month before the March 2018 incident. (*See* Tr. Vol. II at 386-89, 436-37, 518-19.) Nothing in the record suggests any of Roosevelt's prior removals from the program were due to him biting or seriously injuring anyone.

{¶ 12} Although most dogs in the program rotated handlers, Roosevelt was only regularly handled by two senior handlers: Emily Hood and Angel Jayne. (Tr. Vol. I at 61-62, 66-68. *Compare with* Tr. Vol. II at 360-61.) Ms. Jayne testified that Mr. Coleson authorized this arrangement (Tr. Vol. I at 66-68), and Ms. Hood testified that Ms. Dowling endorsed it (Tr. Vol. II at 358-61). Both women received specialized training and were experienced in handling aggressive, reactive "power breed" dogs like Roosevelt. Thus, they were best equipped to control and train him. And, because they interacted with him most consistently prior to the incident, their trial testimony provided the most compelling evidence of Roosevelt's relevant behavioral history.

{¶ 13} Ms. Jayne was Roosevelt's primary handler when he was a puppy. (Tr. Vol. I at 58-62; Tr. Vol. II at 361-62.) Upon his arrival at ORW, Ms. Jayne "beg[ed] to get on the Roosevelt list" because she had an affinity for German Shepherds. (Tr. Vol. I at 58-59.) As a puppy, Roosevelt was rambunctious, had lots of energy, and showed aggressive behavior and dominance issues. (Tr. Vol. I at 61-62; Tr. Vol. II at 350.) But, after Mr. Coleson taught

Ms. Jayne techniques for handling Roosevelt's "alpha" behaviors, Roosevelt began showing respect towards Ms. Jayne and the few other handlers who interacted with him. (Tr. Vol. I at 62, 74-75.) On one occasion, Roosevelt caught Ms. Jayne with his claw while she was in the process of flipping him onto his back—an "alpha roll" technique she was taught to do in response to aggressive behavior. (Tr. Vol. I at 63, Tr. Vol. II at 364.) In addition to lunging at her, Ms. Jayne witnessed Roosevelt exhibit aggressive behavior towards other inmates. (Tr. Vol. I at 64-65.) Ms. Jayne talked to Mr. Coleson on multiple occasions about Roosevelt's behavior; she also memorialized her observations of these incidents and her conversations with Mr. Coleson about them in Roosevelt's handler folder. (Tr. Vol. I at 64-67.) And, at trial, she testified about what she experienced and observed.

{¶ 14} Ms. Hood first began working with Roosevelt when he was seven months old. (Tr. Vol. II at 362.) Before that, Ms. Hood regularly handled the Circle Tail service dogs. (Tr. Vol. II at 351.) These dogs were often Poodles, Golden Retrievers, and Labradors—i.e., breeds that are typically very obedient and gentle-natured. (Tr. Vol. II at 351, 365-66.) Ms. Hood transitioned to staff dogs because, unlike with the service dogs, she could play with and be affectionate towards them. (Tr. Vol. II at 351-52.) Of course, with different dogs came new challenges. Initially, she did not enjoy training Roosevelt because "he had some dominance, aggression issues, and he constantly tried to challenge any handler that handled him." (Tr. Vol. II at 352. *See also* Tr. Vol. I at 75; Tr. Vol. II at 353-368.) At the same time, she described Roosevelt as having "a lot of character and so much personality that most inmates in there wanted to be around him and play with him * * * because he was fun." (Tr. Vol. II at 352. *See also* Tr. Vol. II at 354, 368-69, 426-29.) Of note, Ms. Dillon was one of those inmates. (*See* Tr. Vol. II at 393-94, 429, 499-500, 523, 550-51.)

{¶ 15} Roosevelt growled in Ms. Hood's face shortly after she first began handling him, which prompted Ms. Hood to memorialize her concern that "he was going to hurt somebody" in his handler folder. (Tr. Vol. II at 353-56, 359, 364-65.) Ms. Hood went to Mr. Coleson and Ms. Jayne for advice and techniques to improve her handling of the dog. (Tr. Vol. II at 365, 367-68, 372-73. *See also* Tr. Vol. I at 75.) But, Ms. Hood denied ever reporting incidents of Roosevelt lunging or growling at her (or other handlers) to Mr. Coleson or anyone else employed by ODRC. (*Compare* Tr. Vol. II at 367-68, *with* Tr. Vol. II at 364, 372.) Over time, Ms. Hood saw Roosevelt was amenable to training and his behaviors

improved. (*See* Tr. Vol. II at 356; Tr. Vol. III at 690. *See also* Tr. Vol. I at 108.) Her perception of Roosevelt's purported aggression also changed. (*See* Tr. Vol. II at 368, 444.)

{¶ 16} Nonetheless, since Roosevelt was very strong, big, and not fully trained, Ms. Hood and Ms. Jayne both believed "there was potential there for [Roosevelt] to hurt somebody * * * if they didn't know how to handle him correctly." (Tr. Vol. II at 359. *See also* Tr. Vol. I at 75-76; Tr. Vol. II at 372, 444.) As a result, Ms. Hood usually only asked Ms. Jayne for help with Roosevelt. (Tr. Vol. II at 358-59.) On occasion, Ms. Hood's roommates assisted with caring for Roosevelt. (Tr. Vol. II at 360, 389-92.) As did other inmate-handlers in the program, including Ms. Dillon. (*See, e.g.*, Tr. Vol. II at 483-86.) And, in weekly handler classes, other handlers were able to practice handling Roosevelt with Ms. Hood's supervision and guidance. (*See* Tr. Vol. II at 363-65.)

{¶ 17} Mr. Coleson did not doubt—but did not specifically recall—any conversations he had with Ms. Hood or Ms. Jayne about Roosevelt's behavior prior to March 2018. (*See* Tr. Vol. I at 268-71.) At trial, Ms. Dillon testified she thought Roosevelt was a vicious dog prior to the incident. (Tr. Vol. II at 563-67.) Ms. Dillon nonetheless acknowledged she did not report any concerns about Roosevelt to Mr. Coleson or anyone at the ORW before she agreed to walk Roosevelt and was attacked by him on March 19, 2018. (Tr. Vol. II at 563-68. *See also* Tr. Vol. II at 596; Tr. Vol. III at 650.) Trial witnesses familiar with Roosevelt maintained he was not known to be a vicious dog prior to this incident. (*See* Tr. Vol. I at 115, 145, 158; Tr. Vol. II at 352, 402, 444, 593-96.) In addition to Mr. Coleson and Ms. Dowling, inmate-handlers Ms. Hood, Ms. Custer, and Ms. Yeager all expressly rejected the notion that, prior to March 2018, Roosevelt was a "vicious" or "dangerous" dog.[2] (Tr. Vol. I at 115, 145-46, 158; Tr. Vol. II at 352, 402-03, 593-96, 634-35; Tr. Vol. III at 650.) Multiple witnesses—including Ms. Dillon—testified about Roosevelt "mouthing" (which connotes playful behavior that does not result in puncture wounds) prior to March 2018; but no trial witness—including Ms. Dillon—had any knowledge of him biting or seriously injuring a person or other dog before the incident. (*See* Tr. Vol. I at 68, 108-10, 157-58; Tr. Vol. II at 370-72, 402-03, 439-40, 485-86, 492-97.)

---

[2] Ms. Jayne was not asked to opine on this matter at trial.

**B. The March 2018 Incident**

{¶ 18} In March 2018, Roosevelt was boarding at ORW and Ms. Hood was his assigned handler. Both Ms. Hood and Ms. Jayne were unavailable to walk Roosevelt on March 19, 2018. Thus, on March 17, 2018, Ms. Hood asked Ms. Dillon if she would be comfortable taking Roosevelt out of his kennel for a 30-minute walk that day. (Tr. Vol. II at 507-08.) Ms. Dillon agreed because she "wasn't afraid of Roosevelt" and "really liked" him. (Tr. Vol. II at 508. *See also* Tr. Vol. II at 485-86.) As a residential advisor, Ms. Dillon already had prior experience walking Roosevelt into his room, taking off his collar and leash, and putting him in his kennel. (Tr. Vol. II at 483-84.) She had done this multiple times, without issue. (Tr. Vol. II at 485.) Ms. Dillon testified that if she knew a dog to be vicious, she would not feel comfortable being around that dog. (Tr. Vol. II at 564.)

{¶ 19} To facilitate this endeavor, Ms. Dillon and Ms. Hood walked Roosevelt together on March 17, 2018. (Tr. Vol. II at 394, 508.) Ms. Hood showed Ms. Dillon handling techniques to use when walking Roosevelt and explained the body language and signals to watch out for when interacting with the dog. (Tr. Vol. II at 483, 508.) Ms. Dillon then walked Roosevelt under Ms. Hood's supervision. (Tr. Vol. II at 394, 508.) The next day, Ms. Dillon walked Roosevelt alone. (Tr. Vol. II at 394, 508.) These interactions between Ms. Dillon and Roosevelt on March 17 and 18 were without incident. (*See* Tr. Vol. II at 551-53.) Ms. Hood did not, however, work with Ms. Dillon on leashing and collaring Roosevelt in his kennel or removing his leash and collar after a walk. (Tr. Vol. II at 508.)

{¶ 20} Roosevelt was kept in a kennel in Ms. Hood's dorm room. (Tr. Vol. II at 344.) When Ms. Dillon went to Ms. Hood's dorm room to retrieve Roosevelt from his kennel on March 19, 2018, Roosevelt's tail was up and wagging. (Tr. Vol. II at 509-10, 513.) After closing the dorm room door, Ms. Dillon gave Roosevelt a treat, opened the kennel door, and turned her back to convey to Roosevelt that she was not a danger. (Tr. Vol. II at 510.) Roosevelt exited his kennel and played with Ms. Dillon in the room for a few minutes. (Tr. Vol. II at 510.) Ms. Dillon then asked Roosevelt if he needed to "go hurry," the command used in the program for elimination. (Tr. Vol. II at 510.) Roosevelt signaled in the affirmative, and Ms. Dillon approached him to put on his leash and collar. (Tr. Vol. II at 510, 519.) At that moment, Roosevelt went "whale-eyed." (Tr. Vol. II at 510.) Ms. Dillon

understood that a dog exhibiting that expression is usually anxious, stressed, afraid, or uncomfortable about the current situation. (*See* Tr. Vol. II at 486.) It can also be a sign the dog may soon become aggressive or attack. (Tr. Vol. II at 486.)

{¶ 21} Before Ms. Dillon could let go of the leash, Roosevelt bit one of her arms. (Tr. Vol. II at 510.) Ms. Dillon backed away, but Roosevelt kept attacking her in the dorm room. (Tr. Vol. II at 510.) He bit both of Ms. Dillon's arms multiple times. (Tr. Vol. II at 510.) When Roosevelt jumped toward her face, Ms. Dillon threw her arms up to block him, so he bit her elbow and arms. (Tr. Vol. II at 510.) After sustaining 16 puncture wounds in the attack, Ms. Dillon managed to break free, run out of the room, and close the door. (Tr. Vol. II at 510-11, 520-21.) Her wounds were treated in the infirmary. (Tr. Vol. II at 511, 520-21.)

## C. Events After the March 2018 Incident

{¶ 22} Shortly after Ms. Dillon was attacked, Roosevelt was removed from the program. When he left the program, he was about one and one half years old. (Tr. Vol. I at 231.) Sometime thereafter, Ms. Hood placed Roosevelt's handler folder on the filing cabinet in the basement. (Tr. Vol. II at 400. *See also* Tr. Vol. II at 504-07.) Nothing in the record indicates precisely when she did this.

{¶ 23} In August 2018, counsel for Ms. Dillon contacted ODRC and requested copies of all records pertaining to Roosevelt. (Tr. Vol. I at 274. *See also* Tr. Vol. I at 24-28, discussing Tr. Ex. 1.) In response, ODRC produced copies of records stored in the program office by ODRC staff, which included Roosevelt's kenneling history and owner information. (*See* Tr. Vol. II at 242-43.) Roosevelt's handler folder maintained by the inmate-secretaries was not produced, however, because it could not be located. (Tr. Vol. I at 274-75.) Nothing in the record suggests when Roosevelt's handler folder was disposed of, or, for that matter, precisely which inmate-secretary would have been responsible for the handler folders during the timeframe when his folder was discarded. Mr. Coleson denied accessing Roosevelt's handler folder before or after the incident. (*See* Tr. Vol. I at 268, 274-75; Tr. Vol. III at 687-88.) The record does not support any finding that Mr. Coleson or any ODRC employee disposed of Roosevelt's folder or told anyone else to throw it away.

{¶ 24} After the voluntary dismissal of her original complaint in 2019, Ms. Dillon commenced a civil action in 2020 against ODRC alleging claims of (1) negligence and (2)

spoliation of evidence. She also accused ODRC of being "a harborer of a dangerous dog at its ORW facility." (Jan. 11, 2021 Am. Compl. at ¶ 24 [sic].) After the Court of Claims denied ODRC's summary judgment motion on May 3, 2021, the trial court bifurcated the liability and damages portions of the case for trial. A trial on ODRC's liability for negligence proceeded before a magistrate from May 17 to May 19, 2021 via Zoom.

{¶ 25} In a decision issued September 15, 2021, the magistrate found that Ms. Dillon failed to prove both of her claims by a preponderance of the evidence. The magistrate construed Ms. Dillon's negligence claim as being a common law dog bite action against ODRC and evaluated whether Roosevelt was a "vicious dog," as defined in R.C. 955.11(A)(6)(a). Ms. Dillon timely objected to the magistrate's factual findings. In her objections, Ms. Dillon did not contest the magistrate's evaluation of her negligence claim under a common law dog bite liability theory or the use of the statutory vicious dog standard. (Sept. 29, 2021 Obj. to Mag. Decision.)

{¶ 26} The Court of Claims overruled Ms. Dillon's objections, adopted the magistrate's findings, and entered judgment in favor of ODRC on June 6, 2022. Ms. Dillon timely appealed from that decision and asserts the following assignments of error for our review:

> [I.] The findings of the trial court concerning the viciousness, or lack thereof, of the dog Roosevelt, were based on insufficient evidence, or in the alternative, were not supported by the manifest weight of the evidence.
>
> [II.] The findings of the trial court that the dog Roosevelt was not kept in a negligent manner after Defendant knew, or should have of his viciousness, were supported by insufficient evidence, or in the alternative, were not supported by the manifest weight of the evidence.
>
> [III.] The findings of the trial court that the ODRC handler's records were destroyed because the dog was no longer at the facility, when the dog was removed from the facility after the injury to plaintiff, were supported by insufficient evidence, or in the alternative, were not supported by the manifest weight of the evidence.
>
> [IV.] The trial committed plain error by refusing to consider the deposition transcripts of witnesses who also testified at trial,

when those transcripts had been submitted to the trial court, were referenced at trial, and were not transmitted by the court to this court upon request.

## II. LEGAL ANALYSIS

{¶ 27} Pursuant to Civ.R. 53, a trial court reviews a magistrate's decision de novo. *Skorvanek v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 17AP-222, 2018-Ohio-3870, ¶ 24, citing *Mayle v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-541, 2010-Ohio-2774, ¶ 15, citing *State Farm Mut. Auto. Ins. Co. v. Fox*, 182 Ohio App.3d 17, 2009-Ohio-1965, ¶ 10 (2d Dist.). In ruling on objections to a magistrate's decision, a trial court is required to "undertake an independent review of the matters objected to in order 'to ascertain [whether] the magistrate has properly determined the factual issues and appropriately applied the law.' " *Skorvanek* at ¶ 24, quoting Civ.R. 53(D)(4)(d).

{¶ 28} However, " ' "[t]he standard of review on appeal from a trial court judgment that adopts a magistrate's decision varies with the nature of the issues that were (1) preserved for review through objections before the trial court and (2) raised on appeal by assignment of error." ' " *Williams v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 18AP-720, 2019-Ohio-2194, ¶ 16, quoting *Starner v. Merchants Holding LLC*, 10th Dist. No. 17AP-621, 2018-Ohio-1165, ¶ 15, quoting *In re Guardianship of Schwarzbach*, 10th Dist. No. 16AP-670, 2017-Ohio-7299, ¶ 14; and citing *Feathers v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 16AP-588, 2017-Ohio-8179, ¶ 10; *In re Adoption of N.D.D.*, 10th Dist. No. 18AP-561, 2019-Ohio-727, ¶ 27; *Bickerstaff v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-1028, 2014-Ohio-2364, ¶ 10 (reviewing a trial court's adoption of a magistrate's decision in a negligence action for the manifest weight of the evidence).

{¶ 29} " 'Failure to object to a magistrate's conclusion * * * bars an appellant from assigning as error on appeal the trial court's adoption of that legal conclusion.'" *Williams* at ¶ 22, quoting *Freedom Mtge. Corp. v. Groom*, 10th Dist. No. 08AP-761, 2009-Ohio-4482, ¶ 26, citing Civ.R. 53(D)(3)(b)(iv) (stating "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)"). *See also Hadden Co., L.P.A. v. Zweier*, 10th Dist. No. 15AP-210, 2016-Ohio-2733, ¶ 18 (concluding an argument raised for the first time on appeal is not properly

before the appellate court where the appellant failed to object to the magistrate's decision on that basis).

### A. First, Second, and Third Assignments of Error

{¶ 30} In her first, second, and third assignments of error, Ms. Dillon argues the trial court's factual findings were not supported by sufficient evidence or, in the alternative, were against the manifest weight of the evidence. Accordingly, we will consider these assignments of error together.

{¶ 31} Ms. Dillon raised four objections to the magistrate's decision. The first three objections pertained to her negligence claim. Specifically, Ms. Dillon objected to the magistrate's findings that: (1) she "failed to prove Roosevelt was vicious;" (2) ODRC "did not know or should have [known], of Roosevelt's viciousness;" and (3) "Roosevelt was not kept in a negligent manner after [ODRC] knew of his viciousness." (Sept. 29, 2021 Obj. to Mag. Decision at 8.) After conducting an independent review of the testimony and evidence, the trial court concluded that Roosevelt could not have been considered a "vicious dog," as defined in R.C. 955.11(A)(6), prior to biting Ms. Dillon, and overruled Ms. Dillon's first objection. (June 6, 2022 Decision at 5-8.) Ms. Dillon's first assignment of error challenges this determination.

{¶ 32} Since Ms. Dillon's second and third objections hinged on Roosevelt being vicious—a notion the trial court rejected—the trial court did not make any findings as to ODRC's knowledge about Roosevelt's purported viciousness or alleged negligent keeping of him. (*See* Decision at 8.) Nonetheless, both form the basis for Ms. Dillon's second assignment of error.

{¶ 33} Ms. Dillon's fourth and final objection to the magistrate's decision related to her spoliation claim. Specifically, she objected to the magistrate's finding that ODRC's employees "destroyed the available notes about Roosevelt because he was no longer at the [ORW]." (Obj. to Mag. Decision at 11-13.) Upon its independent review of the matter, the trial court concluded that fatal to Ms. Dillon's spoliation claim was her failure to present any evidence showing Roosevelt's handler folder was willfully destroyed in order to disrupt her case. (Decision at 8-9.) The trial court also opined that Ms. Hood failed to show the disposal of Roosevelt's handler folder disrupted her case because the two almost exclusive

authors of any notes contained therein—Ms. Hood and Ms. Jayne, Roosevelt's regular handlers—testified at trial. (Decision at 10.) Ms. Dillon's third assignment of error challenges the conclusions made in relation to her spoliation claim.

### 1. Standard of Review

{¶ 34} "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19. Sufficiency involves the burden of production, whereas weight involves the burden of persuasion. *See State v. Messenger*, ___ Ohio St.3d ___, 2022-Ohio-4562, ¶ 26, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring). *See also Eastley* at ¶ 19.

{¶ 35} In this case, we are reviewing a judgment rendered in favor of a defendant after a civil bench trial on liability. Ms. Dillon's challenges to the trial court's conclusions involve the weight of the evidence—not the sufficiency.[3] Ms. Dillon's statements of her first, second, and third assignments of error all reference sufficiency challenges, yet she does not actually make any sufficiency arguments in her brief. Thus, our review of Ms. Dillon's first, second, and third assignments of error is limited to her manifest weight challenge. *See, e.g.*, *Morris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-131, 2021-Ohio-3803, ¶ 64, quoting *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 32 (noting that when a trial court has determined a plaintiff "failed to establish that ODRC breached its duty of care, [appellate] review is limited to determining if competent, credible evidence supports the trial court's judgment"). *See generally* App.R. 12(A); App.R. 16(A)(7).

---

[3] We note Ms. Dillon, (who was the plaintiff), does not argue the trial court erred in finding the evidence she presented was insufficient to allow her claims to proceed or that her claims were insufficient as a matter of law. To the contrary, the trial court denied ODRC's motion for summary judgment on both claims and set the case for a liability trial. (*See* May 3, 2021 Decision.) Following the three-day trial, the magistrate issued a detailed decision outlining the facts presented at trial relating to Ms. Dillon's two claims. (*See* Sept. 15, 2021 Decision.) The magistrate did not dismiss the claims in Ms. Dillon's amended complaint or rule as a matter of law. After reviewing the testimony and evidence presented at the liability trial, the magistrate concluded Ms. Dillon failed to prove both of her claims by a preponderance of the evidence. Following its independent review, the trial court agreed. (*See* June 6, 2022 Decision.)

{¶ 36} "With respect to manifest weight challenges, judgments 'supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Morris* at ¶ 64, quoting *Meccon, Inc. v. Univ. of Akron*, 10th Dist. No. 12AP-899, 2013-Ohio-2563, ¶ 15, citing *Watson* at ¶ 31, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. In applying this standard of review, "an appellate court must presume the findings of the trier of fact are correct because it is best able to observe the witnesses and use those observations in weighing the credibility of the testimony." *Morris* at ¶ 64, quoting *Watson* at ¶ 31, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10, citing *Eastley* at ¶ 20.

{¶ 37} Ms. Dillon alleges the trial court's findings on her negligence (dog bite) and spoliation of evidence claims were against the manifest weight of the evidence. In her merit brief, however, she fails to address the "manifest weight of the evidence" concepts referenced in the first, second, and third assignments of error or to demonstrate how the trial court's judgment was against the manifest weight of the evidence.

{¶ 38} "It is the duty of the appellant, not the appellate court, to construct the legal arguments necessary to support the appellant's assignments of error." *Bond v. Village of Canal Winchester*, 10th Dist. No. 07AP-556, 2008-Ohio-945, ¶ 16, citing *Whitehall v. Ruckman*, 10th Dist. No. 07AP-445, 2007-Ohio-6780, ¶ 19-20. When an appellant merely lists an error in her assignments of error but fails to argue it in her brief, we need not address it. *See* App.R. 12(A). *See also* App.R. 16(A)(7). Based on Ms. Dillon's failure to comply with App.R. 12 and 16, we may disregard and summarily overrule her first three assignments of error. *See, e.g., Columbus v. ACM Vision, V, L.L.C.*, 10th Dist. No. 20AP-79, 2021-Ohio-925, ¶ 9-12; *Corbin v. Dailey*, 10th Dist. No. 08AP-802, 2009-Ohio-881, ¶ 7.

{¶ 39} Although Ms. Dillon's brief fails to comply with App.R. 12 and 16(A)(7), we nonetheless exercise our discretion to address her manifest weight arguments.

### 2. Negligence (Dog Bite) Claim—Assignments of Error Nos. 1 and 2

{¶ 40} In her first and second assignments of error, Ms. Dillon argues that the trial court's findings in favor of ODRC on her negligence claim were against the manifest weight of the evidence. We disagree.

### a. Applicable Law

{¶ 41} To prevail on a claim of negligence, a plaintiff must prove, by a preponderance of the evidence, the existence of a duty, a breach of that duty, and injury resulting proximately therefrom. *See, e.g.*, *Taylor v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-1156, 2012-Ohio-4792, ¶ 15; *Forester v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-366, 2011-Ohio-6296, ¶ 7.

{¶ 42} By virtue of the custodial relationship between the state and its inmates, ODRC owes prison inmates a duty of reasonable care and protection from dangerous conditions about which ODRC knows or should know. *Forester* at ¶ 8, citing *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-177, 2004-Ohio-5545, ¶ 16; *Woods v. Ohio Dept. of Rehab. & Corr.*, 130 Ohio App.3d 742, 744-45 (10th Dist.1998). "Reasonable care" is defined as "that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know." *McElfresh* at ¶ 16, citing *Woods* at 745, *Moore v. Ohio Dept. of Rehab. & Corr.*, 89 Ohio App. 3d 107, 112 (10th Dist.1993). *See also Franks v. Ohio Dept. of Rehab. & Corr.*, 195 Ohio App.3d 114, 2011-Ohio-2048, ¶ 12 (10th Dist.).

{¶ 43} While "prison officials owe a duty of reasonable care and protection from unreasonable risks to inmates, * * * they are not the insurers of inmates' safety." *Phelps v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 16AP-70, 2016-Ohio-5155, ¶ 12, citing *McGuire v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 96API04-444, 1996 Ohio App. LEXIS 4274, *11-12 (Sept. 30, 1996). *See also Snider v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-965, 2012-Ohio-1665, ¶ 12.

{¶ 44} In her complaint, Ms. Dillon alleged that ODRC failed to reasonably care for her, as an inmate in its custody, by allowing Roosevelt to remain in the Pawsibility program after he demonstrated "aggressive behaviors." (Jan. 11, 2021 Am. Compl. at ¶ 24-25.) Ms.

Dillon further contended that ODRC knew or should have known Roosevelt was a "dangerous dog" because he had been removed from the program at least once prior to the incident. (Am. Compl. at ¶ 23.) Ms. Dillon alleged that ODRC's act of harboring a dangerous dog constituted a breach of ODRC's duty of care owed to Ms. Dillon, and that such breach directly and proximately caused the injuries she sustained when Roosevelt attacked her on March 19, 2018. (Am. Compl. at ¶ 24-28.)

{¶ 45} Despite the above allegations, the trial court never opined on whether Ms. Dillon successfully demonstrated ODRC's liability for her injuries under a traditional negligence theory. It did not make any findings on whether Ms. Dillon established that ODRC breached its duty of reasonable care by allowing Roosevelt to participate in the program (or if ODRC's liability under a traditional negligence theory was impacted by Ms. Dillon's assumption of the risk, contributory negligence, signed waiver of rights/liability release, or otherwise). In evaluating whether ODRC could be liable for Ms. Dillon's injuries, the trial court repeatedly construed Ms. Dillon's complaint—without objection from either party—as seeking recovery for her injuries under statutory and common law "dog bite" theories of liability (rather than traditional negligence).

{¶ 46} In Ohio, a person who is injured by a dog can generally institute both statutory and common-law actions for damages. *Beckett v. Warren*, 124 Ohio St.3d 256, 2010-Ohio-4, ¶ 7. *See also Vallejo v. Haynes*, 10th Dist. No. 17AP-372, 2018-Ohio-4623, ¶ 14; *E.F. v. Seymour*, 10th Dist. No. 18AP-17, 2018-Ohio-3946, ¶ 16; *Coontz v. Hoffman*, 10th Dist. No. 13AP-367, 2014-Ohio-274, ¶ 10; *Green v. Zack*, 5th Dist. No. 2019 CA 0057, 2019-Ohio-4944, ¶ 43. The statute, R.C. 955.28, imposes strict liability upon the "owner, keeper, or harborer" of a dog "for any injury, death, or loss to person or property that is caused by the dog," subject to certain exceptions. *Beckett* at ¶ 10, quoting R.C. 955.28(B). *See also Coontz* at ¶ 10. Under the common law, a plaintiff must show: (1) the defendant owned or harbored the dog, (2) the dog was vicious, (3) the defendant knew of the dog's viciousness, and (4) the dog was kept in a negligent manner after the keeper knew of its viciousness. *Beckett* at ¶ 7, citing *Hayes v. Smith*, 62 Ohio St. 161 (1900), paragraph one of the syllabus. *See also Coontz* at ¶ 10.

### b. Ms. Dillon abandoned a traditional negligence theory of liability in the trial court and does not attribute error relating to the trial court's construction of her negligence claim on appeal.

{¶ 47} Although Ms. Dillon's complaint alleged a claim for relief under a traditional negligence theory, Ms. Dillon abandoned that theory of liability in the trial court. Her first memorandum opposing ODRC's summary judgment motion contained statements of law related to a traditional negligence claim. But, other than saying ODRC "knew Roosevelt was a stressed dog" and had "knowledge of Roosevelt's prior aggressive behavior," Ms. Dillon provided little argument regarding the breach and proximate cause elements of a traditional negligence claim. (*See* Jan. 4, 2021 Memo. Contra. at 9.)

{¶ 48} Notably, the trial court never made any findings on whether there were any genuine issues of material fact as to breach or proximate cause. Instead, the trial court found that genuine issues of material fact existed regarding material elements of a common law dog bite claim: Roosevelt's temperament prior to the incident (i.e., viciousness) and "whether [ODRC] knew or should have known that Roosevelt was vicious" prior to March 2018 (i.e., foreseeability). (May 3, 2021 Decision at 7.) Since it found that genuine issues of fact remained on these two material elements of a common law dog bite claim, the trial court concluded ODRC was not entitled to summary judgment on Ms. Dillon's negligence claim.[4]

{¶ 49} Neither party objected to or otherwise challenged the trial court's construction of Ms. Dillon's negligence claim as seeking recovery under a common law dog bite theory requiring proof of a dog's viciousness (as opposed to traditional negligence). As a result, that understanding of Ms. Dillon's negligence claim permeated the liability trial, the magistrate's September 15, 2021 decision, and the trial court's final judgment entered on June 6, 2022. Ms. Dillon did not challenge or seek to clarify the trial court's

---

[4] In considering ODRC's summary judgment motion on Ms. Dillon's negligence claim, the trial court also evaluated whether ODRC could be liable under a statutory dog bite theory. The trial court found that Ms. Dillon was a "keeper" of Roosevelt when he attacked her. (May 3, 2021 Decision at 5.) The trial court opined that an injured keeper is not within the class of people the Ohio legislature intended to protect by the strict liability dog bite statute. *See, e.g., Lewis v. Chovan*, 10th Dist. No. 05AP-1159, 2006-Ohio-3100, ¶ 17-19. Accordingly, the trial court found that Ms. Dillon could not, as a matter of law, prevail on a strict liability dog bite claim under R.C. 955.28(B). (May 3, 2021 Decision at 5-6.) Ms. Dillon does not challenge that finding.

understanding of her negligence claim at any point in the trial court. Critically, too, Ms. Dillon does not attribute any error on appeal to the legal standard used by the trial court.

{¶ 50} Since we must regard Ms. Dillon's traditional negligence claim as having been abandoned in the trial court, and because she does not argue the trial court applied the wrong legal standard on appeal, our evaluation of her claim against ODRC for bodily injuries is limited to the common law dog bite theory. *See* App.R. 12(A)(1)(b); *Hawley v. Ritley*, 35 Ohio St.3d 157, 159 (1988), quoting *Uncapher v. Baltimore & Ohio Rd. Co.*, 127 Ohio St. 351, 356 (1933) ("[e]rrors not treated in the brief will be regarded as having been abandoned by the party who gave them birth."). Accordingly, arguments and authority relating to a traditional negligence theory of liability (i.e., breach, duty of reasonable care, and proximate cause) are irrelevant to our analysis in this case.

### c. Analysis

{¶ 51} In evaluating Ms. Dillon's first and second assignments of error, the threshold question is whether there was competent, credible evidence for the magistrate and the Court of Claims to determine that Roosevelt was not a "vicious dog" prior to the incident. We find there was.

{¶ 52} To determine whether Roosevelt was "vicious" for purposes of a common law dog bite action, the magistrate relied upon the Ohio legislature's statutory "vicious dog" definition. (Sept. 15, 2021 Decision at 9-10.) R.C. 955.11(A)(6)(a) defines a "vicious dog" as being "a dog that, without provocation and subject to [R.C. 955.11(A)(6)(b)], has killed or caused serious injury to any person." R.C. 955.11(A)(6)(a). R.C. 955.11(A)(5) defines "serious injury" as referring to any physical harm that (a) "carries a substantial risk of death;" (b) "involves a permanent incapacity, whether partial or total, or a temporary, substantial incapacity;" (c) "involves a permanent disfigurement or a temporary, serious disfigurement;" or (d) "involves acute pain of a duration that results in substantial suffering or any degree of prolonged or intractable pain." With those statutory definitions in mind, the magistrate opined that she could not conclude Roosevelt was a "vicious dog" prior to biting Ms. Dillon because none of the previous behaviors described in the testimony and evidence presented at the liability trial—e.g., mouthing, baring his teeth, snarling, lunging,

scratching, jumping, and generally being a challenge to handle—caused a "serious injury" as defined in R.C. 955.11(A)(5). (*See* Decision at 10.)

{¶ 53} Ms. Dillon objected to that finding. She did not, however, object to the magistrate's use of R.C. 955.11(A)'s "vicious dog" and "serious injury" definitions as the controlling standard for proving the "vicious dog" element of a common law dog bite claim.

{¶ 54} In reviewing the magistrate's finding that Ms. Dillon failed to prove Roosevelt's prior viciousness and ruling on Ms. Dillon's objection to that finding, the trial court noted it "was unable to find a bright line standard for when a dog is vicious for purposes of [proving the 'vicious dog' element of a] common law" dog bite claim. (June 6, 2022 Decision at 6-7.) The trial court thus applied two "vicious dog" standards when it evaluated whether the magistrate's finding was supported by the evidence and testimony presented at trial. In addition to applying the same statutory definitions used by the magistrate, the trial court also applied a "vicious dog" standard it derived from Ohio case law: "[O]nce a dog bites or otherwise attacks someone, it is thereafter considered to be vicious." (*Id.* at 6-7.)

{¶ 55} Based on its independent review of the evidence and testimony presented at trial, the trial court found Ms. Dillon failed to satisfy the statutory "vicious dog" definition set forth in R.C. 955.11(A)(6)(a) because she presented no evidence that Roosevelt had killed or caused "serious injury" to any person prior to the incident. *See* R.C. 955.11(A)(5). (June 6, 2022 Decision at 7-8.) The trial court also found she failed to prove Roosevelt was a "vicious dog" under the standard it derived from Ohio case law because no evidence at trial established he had bitten or attacked anyone prior to March 2018. (*Id.* at 6-7.) As a result, the trial court concluded "that Roosevelt could not have been considered vicious under any of the standards set forth above prior to attacking [Ms. Dillon]." (*Id.* at 8.)

{¶ 56} Although Ms. Dillon challenges that finding in her first assignment of error, she does not attribute any error on appeal to the trial court's use of either standard for purposes of evaluating the "vicious dog" element of a common law dog bite claim. Indeed, Ms. Dillon does not offer any other "vicious dog" standard or definition in her merit brief that she contends applied instead. In addressing Ms. Dillon's manifest weight arguments, then, we will apply the two viciousness standards utilized by the trial court without considering whether a different standard could have applied.

{¶ 57} No evidence or testimony presented at the liability trial showed that Roosevelt had attacked, seriously injured, or bitten—as opposed to "mouthed," explained by multiple trial witnesses as playful behavior (Tr. Vol. I at 110, 157-58; Tr. Vol. II at 440, 485)—any person (or dog) prior to March 2018. Ms. Jayne testified about a scar she had from being scratched by Roosevelt but, as the trial court noted, Ms. Dillon's counsel failed to develop this point on the record. (June 6, 2022 Decision at 8; Tr. Vol. I at 63.) Her scar was not shown at trial; she did not describe it as a serious injury or a permanent disfigurement; and she was not asked about any medical treatment she may have received in connection with it. Further, Ms. Jayne's testimony about the circumstances leading to the scar—while flipping Roosevelt over to lay him on his back, "his claw got me"—also mitigate any notion Ms. Jayne's scar was inflicted by a "vicious dog." (*See* Tr. Vol. I at 63; Tr. Vol. II at 364.)

{¶ 58} Accordingly, we find the trial court's determination "that Roosevelt could not have been considered vicious under [either] of the standards set forth above prior to attacking [Ms. Dillon]" is supported by competent, credible evidence. (June 6, 2022 Decision at 8.) *Compare with Henry Cty. Dog Warden v. Henry Cty. Humane Soc.*, 3d Dist. No. 7-16-06, 2016-Ohio-7541 (affirming "dangerous dog" designation for a dog that scratched and non-severely bit two children under R.C. 955.11(A)(1) because the dog "caused injury"). Indeed, Ms. Dillon does not claim on appeal the "vicious dog" standards used by the trial court were wrong. And, she does not argue the trial court's findings under these standards were not supported by competent, credible evidence in the record. Instead, Ms. Dillon attributes error to the trial court's finding by relying exclusively on *Pickett v. Dept. of Rehab. & Corr.*, Ct. of Cl. No. 2000-02755, 2001 Ohio Misc. LEXIS 64 (Dec. 27, 2001) as support for the contentions she makes in her first assignment of error. Neither the facts nor the legal standard applied in *Pickett* have bearing on our analysis in this case, for three reasons.

{¶ 59} First, *Pickett* is not binding authority upon this court, as it is a decision from the Court of Claims that was not reviewed on appeal. " 'We are bound by the decisions of the Supreme Court of Ohio and generally, by past precedent produced by our own district.' " *See, e.g.*, *Estate of Aukland v. Broadview NH, LLC*, 10th Dist. No. 16AP-661, 2017-Ohio-

5602, ¶ 21, quoting *Keytack v. Warren*, 11th Dist. No. 2005-T-0152, 2006-Ohio-5179, ¶ 51. *See also State v. Dovangpraseuth*, 10th Dist. No. 05AP-88, 2006-Ohio-1533, ¶ 36 (finding that trial court was not bound by cases from other districts).

{¶ 60} Second, *Pickett* is wholly irrelevant to our evaluation of whether Roosevelt was a "vicious dog." The prior viciousness of the dog in *Pickett* was not in dispute, so the trial court neither provided a definition of "vicious dog" nor evaluated whether the dog was "vicious" in that case. In any event, *Pickett* does not support the position advanced by Ms. Dillon in this case. In *Pickett*, evidence presented at trial suggested the dog bit a child less than a month before it bit the inmate-handler (at issue was ODRC's knowledge of the dog's "vicious propensities"). *Id.* at *6. Roosevelt, in contrast, was not alleged to have bitten anyone before March 2018.

{¶ 61} Finally, the language upon which Ms. Dillon relies in *Pickett* pertained to a traditional negligence claim—which, as described above, Ms. Dillon has abandoned. As Ms. Dillon notes in her merit brief, the *Pickett* court held that: "[t]he greater weight of the evidence shows that [ODRC] had actual notice of the vicious propensity of the dog, and its failure to remove the dog from the program constitutes a ***breach of ordinary care*** towards plaintiff. That breach ***proximately caused*** plaintiff's injuries." (Emphasis added.) *Pickett*, 2001 Ohio Misc. LEXIS 64 at *7. The *Pickett* court's factual and legal findings regarding the weight of the evidence presented by the plaintiff to support a traditional negligence claim is immaterial to our examination of the weight of the evidence presented by Ms. Dillon in this case. This is because Ms. Dillon only maintained in the court below and asserts on appeal that ODRC is liable under the common law dog bite theory—not traditional negligence. *Compare with Pickett* at *1 ("Plaintiff asserts that defendant [ODRC] is liable under theories of negligence and strict liability pursuant to R.C. 955.28(B) for injuries he sustained on defendant's premises as a result of a dog bite.").

{¶ 62} For the forgoing reasons, we find the trial court's determination that Roosevelt could not have been considered "vicious" prior to March 2018 under either the statutory definition or Ohio case law is supported by competent, credible evidence in the record. Ms. Dillon's arguments to the contrary lack merit, thus we overrule her first assignment of error.

{¶ 63} In her second assignment of error, Ms. Dillon challenges the manifest weight of the trial court's finding that Roosevelt "was not kept in a negligent manner after [ODRC] knew or should have [known] of his viciousness." Having found no error related to the trial court's viciousness determination, however, our resolution of the first assignment of error controls our disposition of the second assignment of error. Accordingly, we overrule her second assignment of error.

{¶ 64} Furthermore, the trial court did not make any findings as to ODRC's knowledge about Roosevelt's purported viciousness or negligent keeping of him because it found that Roosevelt was not a "vicious dog." An appellate court does not review findings that were not made by the trial court. *See, e.g., O'Brien v. Ohio State Univ.*, 10th Dist. No. 06AP-946, 2007-Ohio-4833, ¶ 10, citing *Hardy v. Fell*, 8th Dist. No. 88063, 2007-Ohio-1287, ¶ 29 ("This court * * * is not a trial court, and we cannot be the de novo trier of fact."). Yet, Ms. Dillon asks us to do precisely that in her second assignment of error. For this reason, none of the arguments she makes in support thereof are well-taken.[5]

{¶ 65} For the foregoing reasons, we find no error by the Court of Claims in adopting the magistrate's finding that Roosevelt was not a "vicious dog" under R.C. 955.11(A)(6)(a). In the absence of evidence that Roosevelt had killed or seriously injured another person prior to biting Ms. Dillon, Ms. Dillon failed to demonstrate ODRC was liable for Ms. Dillon's injuries under the common law dog bite theory recognized in *Beckett*, 2010-Ohio-4. Thus, the trial court properly denied her negligence claim against ODRC.

### 3. Spoliation Claim—Assignment of Error No. 3

{¶ 66} After the March 2018 incident, Roosevelt's handler folder was discarded. This was discovered sometime after Ms. Dillon's counsel asked ODRC in August 2018 to produce all records pertaining to Roosevelt. ODRC's failure to maintain Roosevelt's handler folder forms the basis for Ms. Dillon's spoliation claim, which is the subject of her third assignment of error.

---

[5] Ms. Dillon relies on another case—*Schneider v. Kumpf*, 2d Dist. No. 26955, 2016-Ohio-5161—in support of her second assignment of error. Ms. Dillon's reliance on *Schneider* is not compelling. At issue in *Schneider* was whether a dog warden could be, as a matter of law, liable for the actions of dogs he did not own, harbor, or keep under a common law dog bite theory. In this case, the trial court dismissed Ms. Dillon's claim because it found the evidence and testimony presented at the liability trial failed to prove an essential element: Roosevelt's prior viciousness.

### a. Applicable Law

{¶ 67} The Supreme Court of Ohio has recognized that the independent tort of intentional spoliation of evidence has five elements: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Elliott-Thomas v. Smith*, 154 Ohio St.3d 11, 2018-Ohio-1783, ¶ 10, quoting *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St.3d 28, 29 (1993).

{¶ 68} To satisfy the "willful destruction" requirement, "a plaintiff is required to show that a defendant 'willfully destroyed, altered[,] or concealed evidence.' " *Heimberger v. Zeal Hotel Group Ltd.*, 10th Dist. No. 15AP-99, 2015-Ohio-3845, ¶ 37, quoting *Marok v. Ohio State Univ.*, 10th Dist. No. 13AP-12, 2014-Ohio-1184, ¶ 36, quoting *Drawl v. Cornicelli*, 124 Ohio App.3d 562, 567 (11th Dist.1997). " '[W]illful' reflects an intentional and wrongful commission of the act." *White v. Ford Motor Co.*, 142 Ohio App.3d 384, 387 (10th Dist.2001.), citing *Drawl* at 567-68. " 'Ohio does not recognize a cause of action for negligent spoliation of evidence.' " *Heimberger* at ¶ 37, quoting *Marok* at ¶ 36, citing *White* at 388

### b. Analysis

{¶ 69} In her third assignment of error, Ms. Dillon contends the trial court's finding "that the ODRC handler's records were destroyed because the dog was no longer at the facility, when the dog was removed from the facility <u>after</u> the injury to plaintiff" was against the manifest weight of the evidence. (Emphasis in original.) (Appellant's Brief at 32.) Ms. Dillon raised this argument in her fourth objection to the magistrate's decision. (*See* Sept. 29, 2021 Obj. to Mag. Decision at 11-13.) She did not, however, object to the magistrate's finding that she failed to prove ODRC willfully destroyed Roosevelt's handler folder to disrupt her case, or that her case was, in fact, disrupted by the disposal of Roosevelt's handler folder. (*See id.*)

{¶ 70} Generally, an appellate court will not consider a legal theory or issue a party failed to raise in the trial court. *See, e.g., State ex rel. Zollner v. Indus. Comm.*, 66 Ohio St.3d 276, 278 (1993), citing *State ex rel. Gibson v. Indus. Comm.*, 39 Ohio St.3d 319, 320

(1988) ("A party who fails to raise an argument in the court below waives his or her right to raise it here."). Even if we were to consider Ms. Dillon's third assignment of error, it is not properly before us and lacks merit.

{¶ 71} In conducting its independent review of the magistrate's findings regarding Ms. Dillon's spoliation claim, the trial court did not find ODRC's "handler's records were destroyed because the dog was no longer at the facility, when the dog was removed from the facility <u>after</u> the injury to plaintiff," as is alleged in Ms. Dillon's statement of the third assignment of error. The magistrate made this finding, among others, when she found Ms. Dillon failed to prove her spoliation claim by a preponderance of the evidence. (Sept. 15, 2021 Decision at 11.) In its independent evaluation, the trial court found Ms. Dillon failed to establish a prima facie case of spoliation because she did not prove essential elements of her claim. (June 6, 2022 Decision at 9-10.) Ms. Dillon's claim of error on appeal pertains to the magistrate's findings—not the actions (or findings) of the trial court. But, " '[c]laims of trial court error must be based on the actions taken by the trial court, itself, rather than the magistrate's findings.' " *Morris*, 2021-Ohio-3803 at ¶ 29, quoting *Mayle*, 2010-Ohio-2774 at ¶ 15. *See also Skorvanek*, 2018-Ohio-3870 at ¶ 25, citing *Mayle* at ¶ 15. Therefore, we may disregard this claimed error.

{¶ 72} In any event, the contentions Ms. Dillon makes to support her third assignment of error are not compelling. Instead of attributing error to the trial court's findings, she asks this court to make findings regarding what obligations ODRC may have had to maintain Roosevelt's handler folder. As the trial court noted, though, the failure of an agency to follow its records retention schedule, pursuant to R.C. 149.351(B), is separate and distinct from a spoliation claim, and the Court of Claims does not have jurisdiction over such claim. (June 6, 2022 Decision at 9, citing *Patriot Water Treatment, LLC, v. Ohio Dept. of Natural Resources*, 10th Dist. No. 13AP-370, 2013-Ohio-5398, ¶ 30-37.) Accordingly, Ms. Dillon's arguments regarding ODRC's purported failure to comply with a records retention schedule are irrelevant to our evaluation of whether the trial court's findings are supported by competent, credible evidence.

{¶ 73} On that point, Ms. Dillon does not claim the trial court's findings on her spoliation claim were against the manifest weight of the evidence. But, even if she had, the

trial court's findings on Ms. Dillon's spoliation claim are supported by competent, credible evidence.

{¶ 74} The evidence and testimony presented at trial clearly established that inmate-secretaries involved in the program managed all handler folders prior to, at the time of, and after the March 2018 incident. No evidence suggested ODRC employees reviewed these handler folders or ever accessed them. And, there is no question that before, at the time of, and after the incident, handler folders of dogs that were no longer active in the program were regularly removed from the filing cabinet and discarded by the inmate-secretaries. No witnesses testified about Mr. Coleson—or anyone employed by ODRC—accessing this filing cabinet or directing any program participants to throw away Roosevelt's handler folder or the handler folders for any other inactive dogs.

{¶ 75} In fact, during the liability trial, Ms. Dillon's trial counsel elicited scant evidence regarding the circumstances surrounding the disposal of Roosevelt's handler folder from the people expected to have access to it: Ms. Hood and the inmate-secretaries for the program. Ms. Hood was Roosevelt's handler at the time of the incident. Ms. Hood testified that after the incident, she put Roosevelt's handler folder on the filing cabinet in the basement, as was standard practice for staff dogs inactive in the program. The record is devoid of evidence regarding when she did this, though, because she was not asked this question at trial.

{¶ 76} We also cannot ascertain from the record when Roosevelt's handler folder was discarded or who was the inmate-secretary when that happened. Ms. Yaeger surmised she was the inmate-secretary for the program at the time of the incident. (Tr. Vol. III at 611.) But, there is no evidence or testimony in the record establishing when—between March 19, 2018 (the dog bite incident) and August 24, 2018 (the records request by Ms. Dillon's counsel)—Roosevelt's handler folder was discarded or, for that matter, who threw it away. (*See* Tr. Vol. II at 400-01.) Ms. Custer testified that Alyssa Schuster was the program's inmate-secretary after Ms. Yaeger left that position in March/April 2018. (Tr. Vol. I at 99. *See also* Tr. Vol. II at 610-11.) Jessica Coolville took over that role after Ms. Schuster but before Ms. Custer became an inmate-secretary in 2019. (Tr. Vol. I at 99, 156.) Neither party offered evidence to refute Ms. Custer's historical account. Assuming it to be

true, we can infer that either Ms. Yaeger, Ms. Schuster, or Ms. Coolville held the inmate-secretary role for the program at the time Roosevelt's handler folder was discarded. Yet, no one asked Ms. Yaeger during trial if she knew what happened to Roosevelt's handler folder after Ms. Hood placed it on the filing cabinet. What's more, there is no evidence in the record to establish that anyone actually put Roosevelt's handler folder in the filing cabinet. And, neither Ms. Schuster nor Ms. Coolville testified at the liability trial. If they were deposed, their depositions were not offered as evidence to the trial court during the liability trial.

**{¶ 77}** Based on the testimony and evidence presented at trial, Roosevelt's handler folder was last known, with any degree of certainty, to have been placed on the basement filing cabinet by Ms. Hood at some point after Ms. Dillon was attacked on March 19, 2018. (Tr. Vol. II at 400-01.) We know ODRC was unable to find Roosevelt's handler folder when Ms. Dillon's counsel requested a copy of it approximately five months later. (*See* Tr. Vol. I at 274-75. *See also* Tr. Vol. I at 24-28, discussing Tr. Ex. 1.) Beyond that, the record offers nothing more than speculation about what might have happened to it or who would have been responsible for its subsequent movements.

**{¶ 78}** "Mere speculation or conjecture is insufficient as a matter of law to constitute proof that [ODRC] committed a wrongful or negligent act." *Titenok v. Wal-Mart Stores E., Inc.*, 10th Dist. No. 12AP-799, 2013-Ohio-2745, ¶ 15, citing *Louderback v. Big Bear Stores Co. Big Bear Bakeries*, 4th Dist. No. 96CA569, 1996 Ohio App. LEXIS 4417, *7-8 (Oct. 2, 1996), citing *Westinghouse Elec. Corp. v. Dolly Madison Leasing & Furniture Corp.*, 42 Ohio St.2d 122, 126 (1975). *See also Fifth Third Bank v. Gen. Bag Corp.*, 8th Dist. No. 92783, 2010-Ohio-2086, ¶ 42 (upholding trial court's decision to deny motion to amend complaint to include spoliation of evidence claim when appellants offered no evidence that opposing party acted willfully); *Ciganik v. Kaley*, 11th Dist. No. 2004-P-001, 2004-Ohio-6029, ¶ 38 (concluding that summary judgment was proper when appellant offered no proof that appellee wrongfully destroyed any evidence but instead only speculated).

**{¶ 79}** We find that Ms. Dillon failed to present any evidence at the liability trial to show that Roosevelt's handler folder was willfully discarded by or at the direction of anyone at ODRC. This determination is fatal to Ms. Dillon's spoliation claim.

{¶ 80} Further, Ms. Dillon does not argue ODRC's inability to locate Roosevelt's handler folder actually disrupted her case. No one, including Ms. Dillon, claimed to have knowledge of Roosevelt biting or seriously injuring anyone prior to the incident. Thus, there is no reason to believe his handler folder would have stated that he had. Instead, Ms. Dillon contends Roosevelt's handler folder would have contained information regarding his prior behavioral issues and, potentially, Mr. Coleson's knowledge about them. While that may be true, the absence of Roosevelt's handler did not hinder Ms. Dillon's ability to present this aspect of her case at the liability trial.

{¶ 81} Multiple people familiar with Roosevelt testified that Roosevelt was a "power breed," had dominance issues, was reactive, a challenge to handle, and exhibited aggressive behavior on occasion. Testimony established inmate-handlers raised concerns about Roosevelt's behavior to Mr. Coleson prior to the incident, and that some inmate-handlers feared Roosevelt could end up hurting someone if they did not know how to handle him. Evidence showed Roosevelt was removed from the program multiple times because of his behavior (or stress therefrom), and that he had most recently been removed shortly before Ms. Dillon was attacked. No one disputed that, after Roosevelt was a puppy, he was taken out of rotation in the program and that Ms. Hood and Ms. Jayne were Roosevelt's exclusive handlers because of their experience and knowledge. Both testified at the liability trial, and both women were the only ones who would have recorded notes in Roosevelt's handler folder in the year (if not more) preceding the incident. (*See* Tr. Vol. I at 231.)

{¶ 82} In their testimonies, both women described their observations of Roosevelt and the concerns they reported to Mr. Coleson. Ms. Hood and Ms. Jayne indicated they would have likely memorialized these concerns in Roosevelt's handler folder if they were his assigned handler at the time. Ms. Hood, Ms. Custer, Ms. Yaeger, and Ms. Dillon all testified about behaviors and incidents they observed—but, they would not have memorialized these observations in Roosevelt's handler folder because they were not his assigned handler at that time.

{¶ 83} In her trial testimony, Ms. Dillon claimed that, prior to the attack, she thought Roosevelt was a vicious dog. Assuming that to be true, Ms. Dillon herself acknowledged that she did not report that purported belief to anyone, including Mr. Coleson, before she agreed to walk Roosevelt and was attacked by him in March 2018. (Tr.

Vol. II at 563-68.) And, since Ms. Dillon was never Roosevelt's assigned handler, her belief about his viciousness prior to the incident would not have been memorialized in Roosevelt's handler folder anyway.

{¶ 84} For the foregoing reasons, we find the Court of Claims did not err in adopting the magistrate's findings that no evidence established ODRC "willfully" discarded Roosevelt's handler folder in order to disrupt Ms. Dillon's case or, for that matter, that Ms. Dillon's case was actually disrupted by the disposal of that folder. In the absence of such evidence, Ms. Dillon failed to demonstrate ODRC was liable for intentional spoliation.

{¶ 85} Having reviewed the evidence presented in the instant case, we find the Court of Claims' determination that Ms. Dillon failed to establish by a preponderance of the evidence her negligence and spoliation claims against ODRC to be supported by competent, credible evidence, and thus, not against the manifest weight of the evidence. Accordingly, Ms. Dillon's first, second, and third assignments of error are overruled.

## B. Fourth Assignment of Error

{¶ 86} In her fourth assignment of error Ms. Dillon argues it was plain error for the trial court not to consider the deposition transcript of Emily Hood. We disagree.

{¶ 87} It is undisputed that Ms. Hood's deposition transcript was neither offered nor admitted into evidence during the liability trial. (*See* Tr. Vol. II at 574.) Ms. Dillon contends the trial court should have considered it anyway because it "had already been made a part of the record in that it was filed with the [clerk] in support of [Ms. Dillon's] memorandum contra [ODRC's] motions for summary judgment." (Appellant's Brief at 39.) While her merit brief cites to Civ.R. 32, Evid.R. 801, and Evid.R. 201, Ms. Dillon offers no explanation of how these rules relate to her argument. She offers no legal authority in support of her assertion that a trial court errs—plainly or otherwise—when it fails to consider evidence neither offered nor admitted during trial. Arguments that are perfunctory, undeveloped, and unsupported by pertinent authority are waived. *See, e.g.*, *State v. Watson*, 126 Ohio App.3d 316, 321 (12th Dist.1998), citing *Hawley*, 35 Ohio St.3d at 159 ("An appellate court may rely upon App.R. 12(A) in overruling or disregarding an assignment of error because of 'the lack of briefing' on the assignment of error."). In any event, the argument lacks merit.

{¶ 88} Before the liability trial commenced on May 17, 2021, the trial court ordered the parties to email their proposed exhibits to each other and the court by May 13, 2021. (Apr. 26, 2021 Remote Hearing Notice.) Ms. Dillon's proposed trial exhibits were not timely circulated; nonetheless, the trial court admitted them over ODRC's objection. (*See* Tr. Vol. I at 19-28.) Ms. Dillon's counsel did not identify Ms. Hood's deposition transcript as an exhibit. (*See* Tr. Vol. I at 19-28; May 17, 2021 Pl.'s Ex. List.) Three days before trial, Ms. Dillon's counsel moved to use the deposition transcripts of Ms. Hood and Ms. Custer. (May 14, 2021 Mot. to Use Depo. of Witnesses for Trial Purposes.) But this request was made because Ms. Dillon's counsel feared one or both witnesses might be unavailable for trial. (*Id. See also* Tr. Vol. I at 19-22, 28-32.) So, Ms. Dillon's counsel sought to use their deposition transcripts *in lieu* of their appearances at trial, pursuant to Civ.R. 32(A)(3). (*See id.*) Both witnesses appeared and testified at trial, however, rendering that motion moot.

{¶ 89} Although Ms. Hood's deposition transcript was not offered or admitted into evidence during the liability trial, or included in Ms. Dillon's exhibit list prior to trial, or used in lieu of Ms. Hood's appearance at trial under Civ.R. 32(A)(3), Ms. Dillon contends on appeal that the trial court had an obligation to consider it when rendering its decision on ODRC's liability for the dog attack. This is because, Ms. Dillon argues, the transcript had been previously filed with the clerk and Ms. Dillon's counsel relied on Ms. Hood's deposition testimony "in order to refresh her memory or to impeach her with her prior statement" during the liability trial." (Appellant's Brief at 39.) Those arguments are without merit.

{¶ 90} At trial, Ms. Dillon's counsel asked Ms. Hood if Roosevelt had hurt people prior to the incident. (Tr. Vol. II at 379.) Ms. Hood responded: "No. I believe he just more or less probably scared people. But to say he hurt people, no." (Tr. Vol. II at 379.) Ms. Dillon's counsel then referred to a specific page of Ms. Hood's deposition transcript. (Tr. Vol. II at 379.) ODRC objected to Ms. Dillon's counsel's impeachment of Ms. Hood on direct examination. (Tr. Vol. II at 379-84.) Contrary to what Ms. Dillon now claims on appeal, her trial counsel claimed she was only using Ms. Hood's deposition to refresh her recollection— not "for impeachment purposes." (Tr. Vol. II at 380-82.) At trial, counsel explicitly declined the opportunity to lay a proper foundation that would satisfy Evid.R. 613 so she could use

the deposition to impeach Ms. Hood. (Tr. Vol. II at 380-86.) Ms. Dillon, therefore, waived any argument regarding use of the transcript to impeach. *See, e.g.*, *S & P Lebos, Inc. v. Ohio Liquor Control Comm.*, 163 Ohio App.3d 827, 2005-Ohio-5424, ¶ 12 (10th Dist.); *Zollner*, 66 Ohio St.3d at 276.

{¶ 91} Ms. Dillon's counsel maintained during trial she was using Ms. Hood's deposition transcript exclusively for the purpose of "refresh[ing] her recollections." (Tr. Vol. II at 374. *See also* Tr. Vol. II at 379-81.) Over the objection of ODRC's counsel, the trial court allowed Ms. Dillon's counsel to read into the record portions of Ms. Hood's deposition testimony for that sole purpose. (Tr. Vol. II at 381-86.) Even assuming this was proper under Evid.R. 612, it remained Ms. Dillon's responsibility to move for admission of the transcript into the record. Using a document to refresh a witness's recollection does not automatically result in that document becoming part of the trial record. *See, e.g.*, *Columbus v. LaMarca*, 10th Dist. No. 15AP-440, 2015-Ohio-4467, ¶ 45, quoting *Dayton v. Combs*, 94 Ohio App.3d 291, 298 (2d Dist.1993), citing Evid.R. 612. ("[U]nder Evid.R. 612, '[t]he writing used to refresh the witness's recollection is not admitted into evidence unless admission is requested by the adverse party.' ").

{¶ 92} Nor does the filing of a deposition transcript in connection with summary judgment proceedings automatically render it admissible at trial. Ms. Dillon filed Ms. Hood's deposition in opposition to ODRC's summary judgment motion. (Jan. 4, 2021 Notice of Filing) At that time, the trial court's primary function was to determine whether triable issues of fact existed—not the sufficiency of those facts or the credibility of witnesses. *See, e.g.*, *Napier v. Brown*, 24 Ohio App.3d 12, 13-16 (2d Dist.1985); *Hastings Mut. Ins. v. Halatek*, 174 Ohio App.3d 252, 2007-Ohio-6923, ¶ 22-25 (7th Dist.). In doing this, the trial court found that Ms. Hood's deposition testimony (among others) evidenced the existence of genuine factual disputes "regarding whether ODRC knew or should have known that Roosevelt was vicious." (May 3, 2021 Decision at 7.) This finding did not, however, determine the admissibility *at trial* of any evidence related to that issue. As the proponent of the evidence, it was for Ms. Dillon to persuade the trial court that Ms. Hood's prior deposition transcript should be admitted as evidence in the liability trial under Evid.R. 801, 607, 612, 613, or otherwise. But, she never moved to admit it.

**{¶ 93}** Accordingly, we find the trial court did not err—plainly or otherwise—when it failed to consider Ms. Hood's deposition transcript. For the foregoing reasons, and pursuant to App.R. 12 and 16, Ms. Dillon's fourth assignment of error is not well-taken and is overruled.

### III. CONCLUSION

**{¶ 94}** Having overruled all of Ms. Dillon's assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

LUPER SCHUSTER and BOGGS, JJ., concur.

———————————